UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

CHRISTOPHER J. OSTOSH,

  Debtor.

_____/

KRIEGER CRAFTSMEN, INC.,

  Plaintiff,

-vs-

CHRISTOPHER J. OSTOSH,

  Defendant.

_____/

Case No.  BG 15-04059
Chapter 7

Adversary Proceeding
No. 16-80072

## OPINION REGARDING NONDISCHARGEABILITY OF DEBT AND OBJECTIONS TO DISCHARGE

Appearances:

Steven M. Bylenga, Esq. and Dan E. Bylenga, Jr., Esq., attorneys for Krieger Craftsmen, Inc., Plaintiff.

Timothy L. Taylor, Esq., attorney for Christopher J. Ostosh, Debtor-Defendant.

I.  INTRODUCTION AND ISSUES PRESENTED.

The complaint in this adversary proceeding arises from a long, acrimonious business relationship between Krieger Craftsmen, Inc. ("KCI" or the "Plaintiff") and Christopher J. Ostosh (the "Debtor" or "Defendant").  Specifically, KCI, as successor in interest to West Michigan Community Bank (sometimes referred to herein as "WMCB"), asserts that a debt owed by the Debtor should be nondischargeable because the loan was obtained by use of intentionally false financial statements under § 523(a)(2)(B) of the

Bankruptcy Code.[1]  KCI also asserts that the Debtor should be denied a discharge because he failed to satisfactorily explain a loss of assets under § 727(a)(5), transferred or concealed property with the intent to defraud creditors under § 727(a)(2)(A), and knowingly and fraudulently made false oaths or accounts in his bankruptcy case under § 727(a)(4)(A).  For the reasons that follow, the court holds that the Debtor is entitled to judgment in his favor on all counts of the Plaintiff's complaint.

## II.     JURISDICTION.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); L. Civ. R. 83.2(a) (W.D. Mich.).  This nondischargeable debt action is a statutory core proceeding and this court has constitutional authority to enter a final order.   28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of certain debts); see, e.g., Hart v. Southern Heritage Bank (In re Hart), 564 F. App'x 773, 776 (6th Cir. Apr. 28, 2014) (unpublished opinion) (notwithstanding the Supreme Court's decision in Stern v. Marshall, 564 U.S. 462, 131 S. Ct. 2594 (2011), the bankruptcy court has "constitutional authority to enter a final monetary judgment" in a dischargeability action). Further, even Stern claims may be decided by bankruptcy courts if the parties consent. Wellness Int'l Network, Ltd. v. Sharif, __ U.S. __, 135 S. Ct. 1932 (2015).  While this is not a Stern claim, the parties have consented to this court entering a final order in this adversary proceeding.  (See First Pretrial Order, AP Dkt. No. 12.)

---

[1]     The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

### III.    FINDINGS OF FACT.

A four-day trial was held in this adversary proceeding on February 20 and 21, 2018, and April 9 and 10, 2018.[2]  At the trial, the court heard testimony from four witnesses:  the Debtor; Lynda Ostosh, the Debtor's wife; Jeffrey S. Berens, Executive Vice President and Chief Lending Officer of West Michigan Community Bank; and Doug Bouwman, Chief Executive Officer and shareholder in Commercial Tool & Die.  The Debtor testified extensively, and the court found him to be a credible witness.  Similarly, the court found Lynda Ostosh, Jeffrey Berens, and Doug Bouwman to be credible witnesses.  The court also admitted numerous exhibits into evidence.  After the trial, the parties submitted written closing statements on May 18, 2018, and briefs addressing supplemental legal authority on June 5, 2018.[3]

### A. The Debtor's Prior Work History.

The Debtor began working as a machinist at his family's business, Hamilton Die & Mold, while attending college in the early 1980s.  (Tr. at 19, 21-22.)  In 1983, at age twenty-one, the Debtor formed his own mold machining business, Metal Masters. (Tr. at 25.)  Through his hard work and skills as a machinist, the Debtor built Metal Masters into a successful enterprise.  In his first year, he had sales of approximately $250,000, of which approximately $200,000 was profit.  (Tr. at 26.)  By the time Metal Masters ceased

---

[2]    Transcripts of the trial are available on the court's docket.  See Transcript of Trial – Volume I, February 20, 2018 (AP Dkt. No. 52); Transcript of Trial – Volume II, February 21, 2018 (AP Dkt. No. 53); Transcript of Trial – Volume III, April 9, 2018 (AP Dkt. No. 55); Transcript of Trial – Volume IV, April 10, 2018 (AP Dkt. No. 56).  The transcripts are consecutively paginated and are cited herein as "Tr. at __."

[3]    The legal authority cited was Lamar, Archer & Cofrin, LLP v. Appling, __ U.S. __, 138 S. Ct. 1752 (2018) which was decided by the United States Supreme Court on June 4, 2018.

operations seventeen years later, its average annual sales had grown to between $5 million and $6 million.  (Tr. at 25.)

In 1997, the Debtor stopped operating Metal Masters and joined Corver Engineering as a co-owner.  (Tr. at 30, 34.)  He left Corver after approximately fifteen months due to managerial differences with the other owners and Corver's financial troubles.  (Tr. at 34-35, 475-76.)  Shortly thereafter, in 1998 or 1999, the Debtor was approached by Doug Bouwman and offered a position with Bouwman's company, Commercial Tool & Die.  (Tr. at 35-36.)  The Debtor accepted Bouwman's offer, moved to the Grand Rapids area, and began working for Commercial Tool & Die as a consultant. (Tr. at 36.)  Within a year and a half, the Debtor was promoted to president of the entire Commercial Tooling Group, which consisted of three companies, CG Plastics, CG Automation, and Commercial Tool & Die.  (Tr. at 478.)  According to the Debtor, Commercial Tool & Die's business grew considerably under his leadership:  sales went from $10 to 15 million per year to $33 million per year, the size of the company's facilities tripled, and the company acquired several different machine tools.  (Tr. at 480.) Regardless, by February 2005, Doug Bouwman determined that there was no more room for growth and insisted that the Debtor either take a fifty percent pay cut or be terminated. (Tr. at 480-81.)  The Debtor refused the pay cut and Bouwman fired him.  (Tr. at 93.)

B. The Debtor's Relationship with Krieger Craftsmen.

Krieger Craftsmen, Inc. (herein "KCI") is a plastic injection mold shop located on Three Mile Road in Grand Rapids, Michigan.  (Tr. at 482-83.)  In December 2005, the owner of KCI, Tim Krieger, contacted the Debtor about coming to work for the company.

(Tr. at 39, 482.)  The Debtor began working at KCI as a consultant a few weeks later, in January 2006.  (Tr. at 39, 482, 484.)

From the time the Debtor began working for KCI, the company had financial challenges.  For instance, in early January 2006, when the Debtor began consulting for KCI, the company had an outstanding balance of approximately $530,000 on its line of credit with its primary lender, West Michigan Community Bank.  (Dft. Exh. C.)  According to the Debtor, he immediately started suggesting operational improvements and ways to grow KCI's business, and over time his role at KCI evolved considerably.  (Tr. at 484-85.)  Sales increased and the volume of work at KCI went up.  The Debtor explained that these increased sales required an up-front expenditure of cash for material and wages and a delayed receipt of payment for the finished product.  (Tr. at 494.)   This created additional cash flow issues at KCI.  Throughout the next year and a half, the balance on KCI's line of credit continued to grow, often coming close to its limit of $745,000.  (Dft. Exh. C.)

The Debtor also testified that Tim Krieger talked to him about becoming a partner in KCI or acquiring an ownership interest in the company from the inception of his employment.  (Tr. at 487.)  In October 2006, Tim Krieger made a written partnership offer to the Debtor.  (Plf. Exh. 1.)  Krieger's letter praised the "positive changes" that had happened at KCI during the Debtor's tenure with the company and expressed an interest in bringing the Debtor on as a partner in exchange for a $500,000 cash contribution. (Id.)  The Debtor testified that he was never interested in forming a partnership with Tim Krieger or becoming a co-owner of KCI; nonetheless, there were "a lot of conversations and talk" about the Debtor acquiring some type of ownership interest in KCI.  (Tr. at 486-87; 495-96.)

5

C. The November 27, 2006 Personal Financial Statement.

Tim Krieger also spoke to third parties, including WMCB, about the possibility of the Debtor acquiring an interest in KCI.  (Tr. at 496.)  On November 27, 2006, Jeremy Deutschmann, the loan officer responsible for KCI's account with WMCB, asked the Debtor to fill out a Personal Financial Statement ("PFS").  (Plf. Exh. 2; Dft. Exh. A.)  The circumstances that led WMCB to request the PFS and the purposes for which it was provided are not clear from the record.  Jeremy Deutschmann did not testify at trial, and Jeffrey Berens, the representative of WMCB who did testify, did not know why the personal financial statement was requested.  (Tr. at 353-54.)  He "surmised" that it may have been requested "in preparation for a loan request" or because the Debtor was generally looking to be an investor in KCI.[4]  (Tr. at 352-54.)  Although the Debtor acknowledged that he checked a box at the top of the form marked "Individual Credit," indicating that he was "relying on [his] own income and assets . . . as a basis for extension or repayment of credit," the Debtor testified that he was not seeking a loan from WMCB at the time the PFS was completed.  (Plf. Exh. 2; Tr. at 496, 503.)  Instead, the Debtor stated that he viewed the financial statement as an "accommodation" and a "cursory exercise" that was requested by the Bank based on Tim Krieger's general interest in bringing the Debtor on as a partner in KCI.  (Tr. at 496, 503.)  He filled it out from memory in about twenty minutes and returned it to Deutschmann.  (Tr. at 460.)

---

[4]    Internal emails and an informal credit proposal sent by Deutschmann to Tim Krieger and the Debtor in the weeks following submission of the personal financial statement suggest that WMCB was anticipating an "ownership buy-in" or "equity injection" of $500,000 from the Debtor in the "next few months."  (Plf. Exhs. 3 & 4.)

The Plaintiff asserts that the November 27, 2006, Personal Financial Statement included numerous misrepresentations about the Debtor's assets and liabilities:

1.     *Undisclosed Liabilities.*  The Debtor testified that the $100,000 in "personal property" disclosed on the PFS likely included a Pontiac GTO that he owned at the time and had financed through GMAC.  (Tr. at 58, 582.)  The Debtor also testified that he provided vehicles for his children from the time they turned sixteen until they were at least twenty-one.  (Tr. at 584.)  The PFS states the current ages of the Debtor's children as "20, 19, and 16."  (Plf. Exh. 2.)  However, the PFS does not disclose any liability for the loan used to finance the purchase of the Pontiac GTO or debts relating to the children's vehicles.

The Debtor also testified that he borrowed approximately $100,000 from his parents in the 1990s, to expand and fund Metal Masters.  (Tr. at 466.)  Over the years, he paid down the loan and borrowed additional amounts when he was between jobs.  (Tr. at 56, 467, 580.)  The Debtor acknowledged that some liability to his parents should have been included on his PFS in the section entitled, "Notes Payable – Relatives."  (Tr. at 56-57, 467.)  The Debtor explained, however, that the loan was an informal arrangement and that he could not offer an exact accounting of what was owed at the time the PFS was completed.  (Tr. at 467-68.)

2.     *Accounts and Notes Receivable.*  The Debtor's PFS discloses $25,000 in "accounts and notes receivable."  The Debtor testified that this referred to a debt owed by Special Mold & Engineering to the Debtor's former company, Metal Masters. (Tr. at 60-62.)  Although the Debtor stopped operating Metal Masters in approximately 1997, he

7

testified that he was still pursuing this outstanding debt at the time the PFS was completed.  (Tr. at 30, 61-62.)

3.     *Listed Securities.*    The largest and most egregious misrepresentation alleged by the Plaintiff concerns the $765,000 in stocks listed by the Debtor on the PFS. This amount included:

   a. 1,600 shares of "Detroit Edison (DTE)" stock, with an estimated value of $75,000 (referred to herein as the "DTE stock");

   b. 1,600 shares of "Consumer Power Staple (XLP)" stock, with an estimated value of $40,000 (referred to herein as the "Consumer" stock); and

   c. 1,650 shares of Commercial Tool & Die stock, with an estimated value of $650,000.

The Debtor testified that his grandfather purchased the DTE stock for each of his grandchildren, including the Debtor, in 1969 or the 1970s.  (Tr. at 67-69; 585.)  He initially acquired approximately $5,000 worth of stock for each grandchild, but over time, the dividends were re-invested and the value of the stock increased greatly.  (Tr. at 68-69, 71.)  The Debtor explained that the shares were always in his name and that he paid taxes on the income he received from the dividends.  (Tr. at 69.)  The stock was handled by his grandfather's broker, however, and the statements were always sent to his grandfather's address.   (Tr. at 69-70.)   At some point, the Debtor's DTE stock "mysteriously disappeared."  (Tr. at 75.)  The Debtor's brother, Curtiss Ostosh, was incarcerated in 1994 for committing financial fraud, possibly in conjunction with his grandfather, against other family members.  (Tr. at 501.)  Although the Debtor remains unsure of the details, he stated that he believes his shares of the DTE stock may have

been stolen by his brother and grandfather.  (Tr. at 74.)  However, due to a family rift, the Debtor testified that he did not know the stock had disappeared until 2008 or 2009.  (Tr. at 502.)

With regard to the Consumer stock, the Debtor could not recall when he acquired the shares.  (Tr. at 586.)  He testified that he sold the Consumer shares sometime between 2007 and 2009 and that he believed he owned the stock at the time he completed the PFS in November 2006.  (Tr. at 503, 586.)

The most puzzling and egregious misrepresentation alleged by the Plaintiff concerns the Commercial Tool & Die stock listed by the Debtor on the PFS.  The Debtor explained that this entry on the PFS referred to "phantom stock" in Commercial, which he was promised by the owner, Doug Bouwman, and which had been provided to all of his predecessors as managers of Commercial.  (Tr. at 88.)  Specifically, the Debtor was aware that one of his predecessors at Commercial, Denni Melinn, was given a ten percent phantom stock interest in the company and received over a million dollars when he was terminated from his employment at Commercial.  (Tr. at 95.)  The Debtor testified that he believed – and still believes – that he was entitled to this same consideration, based on representations made by both Melinn and Doug Bouwman.  (Tr. at 94-95.)

Doug Bouwman, the CEO and owner of Commercial, confirmed that Denni Melinn owned stock and phantom stock in the company which was ultimately repurchased by Bouwman.  (Tr. at 408-09.)  Bouwman denied, however, that the Debtor ever had a similar arrangement, testifying that the Debtor never owned common stock, phantom stock, or any other interest in Commercial Tool & Die and was never promised such an interest.  (Tr. at 411-12.)

9

D.  The Debtor's Evolving Role and Worsening Cash Flow Issues at KCI.

In the year and a half following submission of the Debtor's PFS to the Bank, his role at KCI continued to evolve.  The Debtor testified that Tim Krieger was primarily in charge of sales at KCI during this time period, but that Krieger was unable to bring in adequate, profitable work.  (Tr. at 507-08.)  By the end of 2007, there was a "total dearth of new orders" and the Debtor was required to "reach[] out to several of [his] industry contacts" to procure work for KCI.  (Tr. at 508.)  The Debtor's efforts paid off:  in the first half of 2008, he testified that KCI produced $1.5 million worth of sales and in the second half of 2008 the company produced another $3 million in work.  (Tr. at 509.)  As the Debtor described it, "the place was bursting at the seams with work" and he and the employees were working 70 to 90 hours a week, plus most holidays, just to keep up.  (Tr. at 509.)

However, as noted previously, the influx of new work caused KCI's working capital to "dry up."  (Tr. at 511.)  As of mid-September 2007, and throughout 2008, KCI's line of credit with WMCB was drawn to its limit of $745,000.  (Dft. Exh. C.)  KCI had also incurred a significant overdraft at WMCB, which ultimately accrued to $353,000.  (Tr. at 337-38; Dft. Exh. Q.)  An email from Jeremy Deutschmann to Tim Krieger and the Debtor in December 2007, indicated that KCI's checking account had been "overdrawn 145 out of 337 days (43%)" during the past calendar year and that this was "not acceptable" to the Bank.  (Plf. Exh. 6, at 1.)  A follow-up message from Deutschmann indicates that the amount of the overdraft as of December 8, 2007 was $85,000.  (Plf. Exh. 6, at 3.)  Jeffrey Berens testified that this uncured overdraft was a significant concern for the Bank, as even a $25,000 overdraft would have been considered "large" at that time.  (Tr. at 291.)  By December 31, 2007, Deutschmann informed Krieger and Ostosh that the Bank could

10

not and would not cover any additional overdrafts.  (Plf. Exh. 6, at 4.)   Despite this, issues with KCI's overdrawn checking account persisted into early 2008.  (Plf. Exh. 6, at 7.)

During this time frame, discussions about the Debtor buying into KCI also continued.  The Bank was aware of, and involved in, these discussions.  (Tr at 512; Dft. Exh. F.)  According to the Debtor, Jeremy Deutschmann eventually approached him and proposed that the Bank loan the Debtor $100,000, which the Debtor could then invest in KCI as part of his purchase of the company.  (Tr. at 513.)  The Debtor agreed, and the $100,000 loan was executed on June 16, 2008.  (Plf. Exh. 10; Dft. Exh. H.)   The loan had a maturity date of July 18, 2008.  (Id.)  The Bank's internal Officer Loan Committee Report regarding the loan indicates that the loan was to be repaid from "cash flow from operations" and provides the following explanation for the purpose of the loan:

> [The loan] is to provide $100,000 to Chris that he can inject into Krieger in the form of paid in capital.  He and Tim are waiting to sign the buy / sell agreement until Chris has the funds necessary to close the deal.   He liquidated several hundred thousand dollars of Detroit Edison stock last week but has yet to see these proceeds.  This short term note will simply fund working capital needs for Krieger until the acquisition is finalized.

(Plf. Exh. 9; Dft. Exh. G.)  The Debtor testified that the $100,000 was, in fact, put into KCI as working capital, and that KCI always paid the interest on the note.  (Tr. at 109, 522, 547.)  Despite this arrangement, neither KCI nor Tim Krieger was liable under the note.

The Officer Loan Committee Report also lists "[r]eceipt of updated personal financial statement and tax returns" as an additional term and condition of the loan.  (Plf. Exh. 9; Dft. Exh. G.)  It states parenthetically, however, that this information was "not needed to close."  (Id.)  The Debtor testified that no one at the Bank informed him that an updated financial statement was required for the $100,000 loan.  (Tr. at 514-15.)  He also stated that no one at WMCB ever informed him that they were relying on his November

11

2006 PFS in making the loan. (Tr. at 515.) The Debtor explained that, if anyone from the Bank had indicated that they were relying on the November 2006 PFS, he would have told them that the information was "stale" and "constantly changing."[5] (Tr. at 518.)

After the $100,000 promissory note was executed, discussions about the Debtor purchasing KCI continued. In June and early July 2008, various offers and counteroffers were exchanged between Tim Krieger and the Debtor. (Plf. Exh. 13.) The Bank was also actively involved in – and fully supportive of – this process. On June 30, 2008, Deutschmann emailed the Debtor, requesting an updated personal financial statement, tax returns, and bank or brokerage statements "in anticipation of a potential deal with Tim [Krieger]." (Dft. Exh. J.) The Debtor never provided this information. (Tr. at 110-11.) Deutschmann also wrote letters to various potential investors, in an effort to help the Debtor obtain the financing he needed to purchase the company. (Dft. Exh. K.) The letters stated that WMCB was "very excited" about the Debtor's potential acquisition of KCI and indicated that the Bank "fully support[ed]" the Debtor "in this endeavor" because they had "witnessed first-hand his ability to transform KCI into an industry leader." (Id.) On August 27, 2008, Tim Krieger and the Debtor executed a Binding Letter of Intent for the sale of KCI and Krieger, LLC to the Debtor. (Plf. Exh. 14.) Despite these negotiations and agreements, the Debtor explained "[n]othing ever came out of any of it." (Tr. at 112.)

During this time period, the Debtor remained in close contact with representatives of the Bank, who were continually requesting updates on the Debtor's progress at

---

[5]     Although the Debtor's liability on various vehicle loans for himself, his wife, and their three children was omitted from his November 2006 PFS, the Officer Loan Committee Report includes a "Detailed Personal Cash Flow" analysis of the Debtor's finances, which lists four debts to "Ford Motor – Auto" and one to "GMAC – Auto." (Plf. Exh. 9; Dft. Exh. G.)

obtaining financing.  Liquidation of the Debtor's alleged interest in the Commercial Tool & Die phantom stock was mentioned in these conversations, along with other financing options.  In an email dated September 9, 2008, Jeffrey Berens specifically asked the Debtor if he had received his money from the sale of his Commercial Tool & Die stock. (Plf. Exh. 15, p. 1-2.)  On September 10, 2008, the Debtor replied to Berens, indicating that he met with Commercial Tool and that "the new projected date is the 15th for the 400K payment." (Plf. Exh. 15, p. 1.)   The Debtor noted that he was "at [Commercial's] mercy" and was "pushing them as hard" as he could.  (Plf. Exh. 15, p. 1.)   An email from the Debtor to Berens and Deutschmann on September 16, 2008, again stated that the Debtor was scheduled to meet with the owner of Commercial that afternoon, and that he "hope[d] to collect [his] stock money and complete that transaction" at that time.  (Plf. Exh. 15, p. 3.)  The Debtor's email noted, however, that he had experienced "many missed promises" regarding the stock.  (Plf. Exh. 15, p. 3.)  Doug Bouwman, the owner of Commercial, testified that he did not meet with the Debtor on September 10 or 16, 2008, and had no intention of paying the Debtor $400,000 at that time.  (Tr. at 413-14.)  The Debtor testified that Bouwman's recollection on this point was inaccurate.  (Tr. at 497-98.)  He further explained that he had spoken to an attorney about pursing his rights in the stock but had not filed a lawsuit as of September 2008.  (Tr. at 121.)  He maintained, however, that he believed at the time that Commercial owed him money as a result of his phantom stock interest and that he "still believes it's owed to [him] today."  (Tr. at 93-94.)

WMCB's support for the Debtor's acquisition of KCI was likely related to the on-going cash flow issues KCI continued to face throughout the summer of 2008.  In August 2008, the overdraft was approximately $185,000, and by the end of September 2008, it

13

had increased to approximately $353,000.  (Dft. Exh. L & Q.)  As the end of its quarter approached on September 30, 2008, WMCB became increasingly concerned about having the overdraft on its books.  (Tr. at 355-56.)  The Bank told the Debtor that if the overdraft was not remedied, and if the sale of KCI did not move forward, they were going to call KCI's loans and shut the company down.  (Tr. at 527.)  The Debtor explained that shutting the business down at this time would have left WMCB in a "horrible" financial position because so much money had been loaned and spent on materials and labor that resulted in a great deal of work in progress, but which had not yet become finished, saleable product.  (Tr. at 528.)

Ultimately, this situation culminated in the execution of a $500,000 "emergency" loan to the Debtor.  (Plf. Exh. 17; Dft. Exh. P.)  The closing of the loan occurred after normal business hours on the evening of September 30, 2008, timing which the Debtor, his wife, and Jeffrey Berens all described as "unusual."  (Tr. at 275, 356, 532.)  Under the emergency agreement, the Debtor became personally liable on a $500,000 promissory note to the Bank. The Bank also received a second mortgage on the Debtor's home, along with guaranties from KCI and Krieger LLC, as additional collateral for the loan.

Like the report that preceded the $100,000 loan, the Emergency Loan Approval report prepared by WMCB in connection with the $500,000 loan listed "[r]eceipt of updated personal financial statement (not needed to close)" as an additional term and condition of the loan.  (Plf. Exh. 16; Dft. Exh. O.)  The report also indicates that the loan is to be repaid from "Cash flow from operations / Liquidation of Collateral / Enforcement of Guarantees."  (Id.)

The proceeds of the loan were applied to pay off the Debtor's prior $100,000 loan obligation to WMCB, cure KCI's overdraft liability of approximately $353,000, and pay outstanding principal and interest on several other KCI loans.  (Dft. Exh. Q; Tr. at 340, 536.)  Because KCI and the Debtor collectively owed the Bank between $470,000 and $480,000 on these obligations prior to execution of the emergency loan, the primary practical effect of the emergency loan was to shift liability for KCI's portion of the prior debt from KCI to the Debtor personally.  (Tr. at 341-42.)  Jeffrey Berens acknowledged at trial that the $500,000 loan actually only resulted in an "additional risk" to the Bank of between $20,000 and $30,000.  (Tr. at 343.)

It was anticipated by all parties that the emergency loan would be a temporary solution and would eventually be rolled over into new financing as part of the Debtor's acquisition of KCI.  (Tr. at 131; Plf. Exh. 7.)  Consistent with that expectation, the maturity date listed on the loan documents was November 6, 2008.  (Plf. Exh. 17; Dft. Exh. P.)  The $500,000 loan was rolled over on November 5, 2008, and KCI continued to pay the interest due under the loan agreement.  (Dft. Exh. T; Tr. at 546-47.)  However, Tim Krieger and the Debtor never reached an agreement for the Debtor's purchase of the company.

By early 2009, both the automotive industry and the relationship between Tim Krieger and the Debtor had taken significant downturns.  Negotiations between Krieger and the Debtor for the purchase of KCI fell apart completely, and in March 2009, KCI stopped paying the Debtor.  (Tr. at 463-64.)  In an email dated April 6, 2009, the Debtor attempted to make a deal with Krieger and the Bank that would allow for payment of his March wages, repayment of his "500K capital infusion," and thirty days of continued work for KCI to collect outstanding accounts receivable.  (Plf. Exh. 24.)  The Bank did not

consider these demands reasonable, and April 20, 2009, Tim Krieger terminated the Debtor's employment with KCI and the Debtor left the business premises. (Plf. Exh. 24; Tr. at 39, 143.)

After the Debtor's departure from KCI, Tim Krieger and WMCB worked to collect KCI's accounts receivable. (Tr. at 372; 555-56.) Nearly $1 million was collected on these outstanding receivables, a large portion of which came from customers the Debtor brought in. (Dft. Exh. C; Tr. at 556-58.) Despite the Debtor's requests that these amounts be used to pay down the $500,000 promissory note, they were applied to pay off KCI's $745,000 line of credit with WMCB. (Dft. Exh. C; Tr. at 557-59.)

E. State Court Litigation.

In September 2009, WMCB sued the Debtor on the $500,000 promissory note in the Kent County Circuit Court.[6] On December 6, 2010, the state court entered a judgment for $587,514.19 in favor of WMCB and against the Debtor. (Plf. Exh. 26; Tr. at 149.) On January 31, 2011, the judgment was assigned to WMCB's parent company, Fentura Holdings, LLC. (Plf. Exh. 26.)

At some point in 2009, the Debtor also filed litigation against KCI which included claims for breach of contract and unjust enrichment relating to KCI's failure to repay the

---

[6]     The state court complaint was not offered into evidence at trial but is part of the summary judgment record that was previously submitted to the court. See Defendant's Motion for Summary Judgment, AP Dkt. No. 27 & 29, at Exh. N. In his motion for summary judgment, the Debtor noted that the sole cause of action asserted by WMCB's state court complaint was for breach of contract. Because WMCB could have pled fraud claims against the Debtor in the state court action but did not, the Debtor argued that the doctrine of res judicata, or claim preclusion, barred the Plaintiff's claims for fraud in this adversary proceeding. The court rejected the Debtor's res judicata argument for the reasons stated in its Bench Opinion Regarding Cross-Motions for Summary Judgment. See Transcript of Bench Opinion, AP Dkt. No. 38.

$500,000 loan.  After a five-day arbitration held in December 2013, the Arbitrator issued an Opinion, Findings and Order.  (Dft. Exh. Y.)  The Arbitrator's opinion, which was entered on April 14, 2014, concluded that KCI was unjustly enriched by the $500,000 investment which resulted from the WMCB loan to the Debtor.  (Dft. Exh. Y.)  After adjusting the damages for additional amounts owed to the Debtor and offsetting for liabilities and losses attributable to the Debtor, the Arbitrator entered an award in favor of the Debtor and against KCI for $196,091.00.  (Id.)

On July 1, 2014, Fentura Holdings, LLC assigned its judgment against the Debtor to KCI.  (Plf. Exh. 26.)  According to the assignment agreement, KCI paid $100,000 to purchase the judgment.  (Id.)

F.  The Debtor's Prepetition Personal Finances.

Despite the financial challenges at KCI, the Debtor's termination from his position there, and other temporary interruptions in the Debtor's employment, it is undisputed that the Debtor had a significant income in the years leading up to his bankruptcy filing.  (Plf. Exh. 29.)  The Debtor testified that he made approximately $20,000 per month, or $240,000 per year, during his employment with KCI.  (Tr. at 464.)  In October 2009, approximately six months after leaving KCI, the Debtor began working for Detail Technologies.  (Tr. at 463-64.)  He currently serves as the company's President, CEO, and Chairman of the Board.  (Tr. at 174.)  The Debtor testified that his pay at Detail Technologies was roughly the same as his compensation at KCI:  approximately $20,000 per month. (Tr. at 464.)

The Debtor also acknowledged that he and his family enjoyed "a very favorable lifestyle" and were essentially spending all of his income as it came in.  (Tr. at 473.)  The

17

Debtor attributed this to the fact that he had "always had the capability as an individual to earn a high wage" and that he could "continually replicate his income." (Tr. at 473.)

The evidence at trial established that much of the Debtor's spending was directed toward his three children. Although the children were grown and out of the house by the time the bankruptcy case was filed in July of 2015, the Debtor testified that he and his wife "doted a lot on [their] children" while they were in high school and college. (Tr. at 473.) Specifically, the Debtor bought or leased each of them a car when they turned sixteen, paid for the gas, insurance, and maintenance on the vehicles, paid for their cellphones, and paid for them to attend private high school. (Tr. at 435, 568.) He also paid for two of his children to attend college and/or trade school and helped all of the children with living expenses while they were in school. (Tr. at 213-14, 217-18, 220-21.) In May of 2014, the Debtor also paid for his youngest son's wedding, which was held in Hawaii. (Tr. at 221.) The Debtor could not recall exactly which wedding expenses he paid for. (Tr. at 222.) He explained that his wife would generally ask him for money for the wedding, and he would give her the necessary cash. (Id.) The Debtor also could not recall exactly how much he paid toward the wedding, and he did not produce any documentation of the expenses. (Tr. at 221.) He estimated, however, that his total contribution was between $8,000 and $20,000. (Id.) The Debtor's wife also testified that she and her husband paid $10,000 or $11,000 toward their daughter's wedding in 2011. (Tr. at 257.)

In addition, the Debtor testified that he loaned his eldest son $35,000 to help fund a business the son was starting in the years preceding the bankruptcy filing. (Tr. at 570-71.) The Debtor explained that he borrowed the funds used to make the loan from Team

Financial Group, Inc.  (Tr. at 570-71.)  The Debtor could not recall the date this loan was made but estimated that it occurred more than two years prior to the filing of the bankruptcy case.  (Tr. at 210.)  The son's business was ultimately unsuccessful, and the company ceased operating.  (Tr. at 211-12.)

Finally, the testimony at trial established that the Debtor consistently gave his wife $400 per week for household and incidental expenses.[7]  (Tr. at 225-26.)  The Debtor also incurred significant expenses for his wife to travel to California to visit their son, daughter and son-in-law, and eventually their grandchildren, on a regular basis.  In early 2015, while their daughter was pregnant, the Debtor paid for his wife's travel and accommodations in California approximately once a month.  (Tr. at 456-57.)  After their first grandchild was born in July of 2015, the Debtor's wife began traveling to California to babysit on a weekly basis and flying back to Michigan on the weekends.  (Tr. at 274.)  The Debtor estimated that his wife made nine or ten trips to California in 2015.  (Tr. at 182.)  At some point in 2016, after the bankruptcy filing, the Debtor's daughter took over paying these travel expenses.  (Tr. at 274, 457-58.)

Although the unrefuted testimony presented at trial made it apparent that the Debtor and his family were spending significant amounts of money in the years leading up to the bankruptcy filing, the Debtor's spotty memory and the overall lack of documentary evidence made it difficult to determine exactly how the money was spent. The Debtor attributed his lack of documentation to the fact that he began operating on a "cash basis" at some point in 2011, 2012, or 2013, after his checking account was

---

[7]     The Debtor testified that his wife used this money to pay for "food, incidentals, health care products . . . shampoo, whatever."  (Tr. at 226.)

garnished.  (Tr. at 223-24; 447-48.)  The Debtor explained that the garnishment caused a "domino effect," and that he switched to cash to avoid the hassle and cost of bouncing checks.  (Tr. at 446-47.)  After making this change, the Debtor testified that he would receive his paychecks from his employer, Detail Technologies, and put them in his desk drawer.  (Tr. at 224.)  When he needed money, the Debtor would take the checks to the bank and convert them either to cash or a certified check to pay his bills.  (Tr. at 224-25.)  He would also give cash to his wife, so that she could pay certain expenses.  (Tr. at 225-26.)  The Debtor testified that he and his wife discarded many of their financial records when they were forced to move out of their home, although he could not recall exactly when that occurred.  (Tr. at 223, 574.)

G.  The Bankruptcy Case and Adversary Proceeding.

The Debtor filed his voluntary chapter 7 petition on July 17, 2015.  KCI filed this adversary proceeding against the Debtor on March 31, 2016, alleging not only that the judgment debt it had acquired should be nondischargeable, but also that the Debtor should be denied a discharge based on various inaccuracies and omissions in his bankruptcy petition, schedules, and Statement of Financial Affairs ("SOFA"). The facts relevant to those arguments are summarized below.

1.  *The Debtor's Income and Expenditures.*

The Debtor's schedules and Statement of Financial Affairs ("SOFA") reflect the Debtor's current employment at Detail Technologies.  The Debtor's SOFA indicates that he had an annual income of $208,000 per year during 2013 and 2014.  (Plf. Exh. 29.) The SOFA also states that the Debtor's year to date 2015 income was $170,000.  (Id.) At trial, the Debtor testified that he calculated these amounts based on his weekly income

20

of approximately $4,000 per week. (Tr. at 427-28; Plf. Exh. 31.)  The Debtor explained that his 2015 year to date income included this weekly income ($4,000 per week for approximately 30 weeks), plus $50,000 in bonuses he received in early 2015.[8] (Tr. at 428.)

Despite the lack of back-up documentation, the bankruptcy petition and other evidence presented at trial is generally consistent with the Debtor's overall testimony about his spending habits.  The Debtor's Schedules I and J, which provide a "snapshot" of the Debtor's spending as of the July 2015 filing date, indicate that the Debtor and his wife have monthly expenses totaling $17,317, which is just $16.00 less than the Debtor's $17,333 monthly income.  (Plf. Exh. 28.)  These expenses included $3,207 per month for the Debtor's residence, even though the Debtor testified that he stopped making his mortgage payment when it became clear he was going to lose the house in "April, May or June" of 2015.  (Tr. at 180, 469-70.)  The Debtor's schedules note this potential change, however, stating that the Debtor anticipates the expense for any new housing he arranges "will be similar to the present expenses."  (Plf. Exh. 28.)  This assertion was not challenged at trial.  The listed expenses also include on-going tax liability of $4,350 per month and

---

[8]     At trial, the Debtor acknowledged that the annual income disclosed on his SOFA differed from the amounts included on his 2013 and 2014 tax returns.  (Tr. at 432-33.) Schedule C of the Debtor's 2014 federal tax return, for instance, states that the Debtor had a gross income of $225,577 in 2014, and a net profit of $190,948 after deducting expenses.  (Plf. Exh. 37.)  The "Two-Year Comparison Worksheet" included in Schedule C of the 2014 return states that the Debtor's gross income for 2013 was $264,899 and that his net profit was $222,999 after deducting expenses.  (Id.)  The Debtor testified that the amounts disclosed on his SOFA were intended to reflect his "gross income as it actually is received" and were "within 10 percent" of the income reported on his tax returns.  (Tr. at 430, 433.)  For purposes of this opinion, the court accepts the amounts stated in the SOFA as appropriate estimates of the Debtor's annual income for the two and one-half years preceding the bankruptcy filing.

"past tax debt" obligations of $3,300 per month.  The Debtor testified that he consistently had a large carryover tax debt in the years leading up to his bankruptcy filing, and that he paid his tax arrearages in lump sums, rather than on a consistent, monthly basis.  (Tr. at 167-68; Dft. Exh. Z.)  The Debtor explained, however, that the amounts listed on Schedule J were estimates intended to reflect that he was paying approximately $36,000 toward tax arrearages annually and incurring approximately $50,000 in new tax liability on a go forward basis.  (Tr. at 205, 439-40.)  Outside of these items, the other amounts listed on Schedule J, though high in some instances,[9] appear to be an accurate representation of the Debtor's expenses as of the filing date.

To document his spending in the years leading up to his bankruptcy filing, the Debtor offered a summary exhibit, Defendant's Exhibit CC, at trial.  The Debtor testified that he prepared Exhibit CC "in conjunction with" his attorney as "part of [his] whole bankruptcy litigation."  (Tr. at 568.)  He could not recall when the summary was prepared and testified that it was generally intended to be "an average for the last ten years of expenses prior to filing for bankruptcy."  (Tr. at 568.)  To the extent backup documentation was used in preparing the summary exhibit, it was not offered into evidence at trial.  (Tr. at 569-70, 575.)  Nevertheless, Exhibit CC was admitted into evidence by stipulation of the parties.  (Tr. at 15.)

---

[9]     For example, Schedule J states that the Debtor and his wife spend $600 per month on clothing, laundry, and dry cleaning.  This amount seems high, particularly in light of the Debtor's testimony that he does not have to dress up for work and does not own any suits or other clothing that are individually worth more than $500.  (Tr. at 164.)  The Debtor's Schedule B indicates that the total value of the "wearing apparel" owned by the Debtor as of the filing date was $800.  (Plf. Exh. 28.)

Exhibit CC estimates that the Debtor's fixed expenditures on items such as taxes, his mortgage, insurance, utilities, the $400 per week provided to the Debtor's wife for household expenses, and the costs of his wife's vehicle totaled between $127,200 and $146,200 per year in the ten years preceding the Debtor's bankruptcy filing. The exhibit also lists annual expenditures of approximately $4,000 per year for "repairs" and "maintenance," $5,000 to $20,000 in professional fees, $7,000 to $10,000 for food, $3,000 to $5,000 in unreimbursed medical expenses, and $5,000 to $6,000 per year for clothing and dry cleaning. The total of these expenses, which were consistently incurred by the Debtor on an annual basis throughout the prepetition period, ranges from $151,200 to $191,200.

In addition to these amounts, Exhibit CC references several variable expenditures that the Debtor made on behalf of his wife and children in the ten years prepetition. These items include "at least one year" of private high school tuition at $8,000 per year, college and/or living expenses "for some of the time," $25,000 to $35,000 for the children's weddings, car payments for the children "for some of the time," and the cost of repaying Team Financial for the amounts that were loaned to the Debtor's son, which the Debtor estimated as "approximately $30,000 paid over several years."[10] (Dft. Exh. CC.)

The cost to the Debtor of his wife's trips to California is also reflected on Exhibit CC as "Transportation Expenses," and estimated at between $5,000 and $10,000 per year. (Dft. Exh. CC; Tr. at 577.) The exhibit also references "greater amounts provided to wife," stating that these amounts were "variable." (Dft. Exh. CC.)

---

[10]   The Team Financial obligation and loan to the Debtor's son are listed as two separate line items on Exhibit CC. The court has construed them as a single obligation.

23

2.   *Disclosures in the Debtor's Statement of Financial Affairs.*

The Plaintiff alleges that the Debtor's SOFA contains various misrepresentations and omissions, particularly involving prepetition transfers made by the Debtor. In response to question 3, "Payments to creditors," the Debtor discloses the monthly payments of $1,614 that he was making to Team Financial Group, Inc. in the ninety days preceding the filing date, relating to amounts he borrowed and subsequently loaned to his son. (Plf. Exh. 29; Tr. at 570-71.)  A note made by the Debtor in response to Question 10a of the SOFA, which requires the disclosure of transfers made within two years of the filing date outside of the ordinary course of business, states:  "The Debtor invested funds in a company started by his son on the east side of the state, but this was more than two years ago.  The company has since closed." (Plf. Exh. 29.)  When asked whether the amounts owed to him by his son were listed as accounts receivable in his bankruptcy case, the Debtor acknowledged that they were not.  (Tr. at 211.)  He explained that he did not include those amounts because "[i]t was already a foregone conclusion" that the loan was "uncollectable," because his son had stopped operating the company and had no ability to personally repay the loan.  (Tr. at 211-12.)  The Debtor also testified that he believed he had written off the loss relating to the loan at some point, although he could not remember when.  (Tr. at 219.)

In response to question 7, regarding gifts made in the year prior to the petition date, the Debtor listed "various" monetary gifts to Calvary Church.  (Plf. Exh. 29.)  No other prepetition transfers are disclosed on the SOFA.

Despite this, the Plaintiff asserts that several transfers occurred that should have been included on the SOFA.  Specifically, the Plaintiff argues that the Debtor sold assets

24

in the year prior to the filing of his bankruptcy case,[11] paid living expenses for his oldest son while he was completing his master's degree,[12] paid undergraduate educational and living expenses for his youngest son through 2013,[13] paid for his youngest son's Hawaiian wedding in 2014,[14] gave his wife $400 per week for household and incidental expenses, and paid for her trips to California prior to the bankruptcy filing.  The Plaintiff argues that all of these transfers should have been disclosed under Question 10a of the Debtor's SOFA, as having been made outside of the ordinary course of business and within two years of the filing date.  The Plaintiff further argues that to the extent money was provided by the Debtor to his wife and then "indirectly" used to pay creditors, those transfers should have been listed under question 3c, which requires disclosure of payments made within one year of filing "to or for the benefit of creditors who are or were insiders."

## IV.    DISCUSSION.

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'"  Marrama v. Citizens Bank of Massachusetts, 549 U.S.

---

[11]    The Debtor testified that he sold various household items, including a snowblower, lawn mowers, couches, and a television when he moved out of his home.  (Tr. at 164.) He stated that those items were sold in the year prior to his bankruptcy filing and were not replaced.  (Tr. at 163-64.)

[12]    The Debtor testified that he had given his oldest son "a little bit of money here and there" while his son completed his graduate studies.  (Tr. at 217.)  The record was not clear, however, as to when these transfers may have occurred or how much may have been paid.  The son apparently received his undergraduate degree in 2009 or 2010, and only recently obtained his master's degree.  (Tr. at 218.)

[13]    (Tr. at 220-21.)

[14]    (Tr. at 221.)

25

365, 367, 127 S. Ct. 1105, 1107 (2007) (quoting Grogan v. Garner, 498 U.S. 279, 286-87, 111 S. Ct. 654, 659 (1991)).  Toward that end, "the Bankruptcy Code contains broad provisions for the discharge of debts, subject to exceptions." Lamar, Archer & Cofrin, LLP v. Appling, __ U.S. __, 138 S. Ct. 1752, 1758 (2018).

In chapter 7 cases, § 727(a) generally discharges an individual debtor from personal liability on prepetition debts unless one of the ten enumerated grounds for denial of discharge applies.  Because "the denial of a debtor's discharge is a harsh outcome" and may "work a serious deprivation upon a debtor," the "provisions of § 727(a) are to be construed liberally in favor of granting debtors the fresh financial start contemplated by the Bankruptcy Code and the Supreme Court." Clippard v. Jarrett (In re Jarrett), 417 B.R. 896, 901 (Bankr. W.D. Tenn. 2009) (citing Meyers v. Internal Revenue Service (In re Meyers), 196 F.3d 622, 624 (6th Cir. 1999)) (additional citation omitted).  In proceedings under § 727, the plaintiff bears the burden of proving by a preponderance of the evidence that the debtor should be denied a discharge.  See Fed. R. Bankr. P. 4005; Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir. 2000).

Section 523(a) also excepts certain types of debts from a debtor's discharge.  Like the grounds for denial of discharge, § 523(a) exceptions to discharge are strictly construed against the creditor.  Rembert v. AT&T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998).   A creditor seeking to except a particular debt from discharge under § 523(a) has the burden of establishing each element of its nondischargeable debt cause of action by a preponderance of the evidence.  Grogan, 498 U.S. at 286-87.

26

The Plaintiff in this adversary proceeding asserts that the debt owed under the state court judgment should be excepted from the Debtor's discharge under § 523(a)(2)(B), and more generally, that the Debtor's discharge should be denied in its entirety under § 727(a)(2)(A), (a)(4), and (a)(5) due to inaccuracies and omissions in the Debtor's bankruptcy case.  Each of these arguments shall be addressed in turn.

A.  Nondischargeability under § 523(a)(2)(B).

To begin, the Plaintiff has asserted that the judgment debt it acquired from West Michigan Community Bank is nondischargeable under § 523(a)(2)(B) because the Debtor obtained the loan from WMCB by use of materially false written financial statements which were intended to mislead the Bank.  Section 523(a)(2)(B) excepts from discharge any debt:

> (2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
> (B)    use of a statement in writing –
>
> (i)    that is materially false;
>
> (ii)   respecting the debtor's or an insider's financial condition;
>
> (iii)  on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv)   that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).  "To prevail under § 523(a)(2)(B), a creditor must satisfy the precatory language" that the debtor obtained money, property, services, or an extension, renewal, or refinancing of credit by use of a written statement and must also "prove each of the listed four elements" by a preponderance of the evidence.  National City Bank v.

Plechaty (In re Plechaty), 213 B.R. 119, 123 (6th Cir. B.A.P. 1997); see Grogan, 498 U.S. at 286-87.

In this case, there is no question that the $500,000 emergency loan obtained by the Debtor from WMCB on September 30, 2008, created a debt for money and constituted an extension, renewal, or refinancing of credit.  It is likewise undisputed that the statements that the Plaintiff has alleged were false were made by the Debtor, in writing, as part of the November 27, 2006, Personal Financial Statement and in subsequent email communications in the months leading up to the emergency loan.  Finally, there is no question that the alleged misstatements about the Debtor's ownership of assets and understatements of his liabilities pertained to the Debtor's financial condition. See Lamar, Archer & Cofrin, LLP v. Appling, __ U.S. __, 138 S. Ct. 1752, 1757 (2018) (holding that even a "statement about a single asset" can be a "statement respecting the debtor's financial condition" for purposes of § 523(a)(2)(B)).

The § 523(a)(2)(B) elements that are disputed in this adversary proceeding are whether the Debtor's statements in the PFS and subsequent email communications were intentionally and materially false, and if so, whether and to what extent WMCB reasonably relied on those statements – the majority of which were made in a PFS completed almost two years before the emergency loan – when deciding to make the $500,000 loan to the Debtor.[15]

---

[15]   The practical challenge of articulating the causal relationship between the Debtor's statements to WMCB, the Bank's issuance of the $500,000 emergency loan, and the current cause of action asserted by KCI (the entity that actually received the proceeds of the loan) is further complicated by the fact that the judgment debt stemming from the loan was subsequently assigned from WMCB to KCI.  However, the Sixth Circuit Court of Appeals has previously held that a successor-in-interest such as KCI, "may stand in place of the original creditor to seek non-dischargeability under § 523(a)(2)(B)." Pazdzierz v.

28

*1. Were the Statements Materially False?*

The first question is whether the statements made in the Debtor's November 2006 PFS and September 2008 email communications were materially false.  "A [financial] statement is materially false if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." Insouth Bank v. Michael (In re Michael), 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001).

It is clear that the Debtor's failure to include his liability for the loan used to finance his Pontiac GTO, his liabilities for his children's vehicles, and the loan from his parents on the November 2006 PFS constituted false statements.  The Debtor testified truthfully at trial that these amounts were owed and, at least with respect to the loan from his parents, should have been disclosed on the PFS.  The materiality of these false statements is a closer question.  Based on the evidence presented at trial, it is apparent that the Bank had knowledge of the vehicle loans prior to making the initial $100,000 loan to the Debtor in June 2008.  See Plf. Exh. 9, Dft. Exh. G, and note 6 supra.  Given the Debtor's testimony about the informality of the loan from his parents, and the lack of any specific payment schedule, the existence of this obligation may have had little practical impact on the Debtor's overall financial viability.  Still, the court concludes that the failure to list the vehicle loans and debt to the Debtor's parents on the PFS were material misstatements.

---

First American Title Ins. Co. (In re Pazdzierz), 718 F.3d 582, 590 (6th Cir. 2013).  The parties have not argued otherwise.  In accordance with Pazdzierz, this court holds that KCI may bring this nondischargeable debt cause of action as assignee of the WMCB judgment debt.  The focus of the court's analysis is on the actions taken by the Debtor and WMCB at the time the loan was obtained by the Debtor.

The inclusion of the $25,000 receivable owed to the Debtor's former company, Metal Masters, on the PFS is also a false statement, given the Debtor's testimony that Metal Masters was a separate corporate entity that ceased operating in approximately 1997.  This statement was material, to the extent it contributed to painting an inaccurate picture of the Debtor's finances.

The evidence presented at trial regarding the truth or falsity of the Debtor's statements about his ownership of the DTE and Consumer stocks was somewhat mixed. Although the Debtor testified that his brother Curtiss was prosecuted in 1994 for financial fraud, which may have included theft of the Debtor's DTE stock, he stated that he did not become aware of the disappearance of this stock until 2008 or 2009.  The Debtor also testified that he sold his Consumer stock between 2007 and 2009, and that he believed he owned it at the time the PFS was completed.  To counter this testimony, the Plaintiff argued that the Debtor's recollection regarding both of these assets was implausibly vague and attempted to show that the Debtor did not own the DTE and Consumer stock when the PFS was completed.  The Plaintiff offered the Debtor's 2005 tax return as proof that the Debtor did not disclose any dividend income from either of these stocks prior to completion of the PFS.  In addition, the Plaintiff noted that sale of the Consumer stock was not reflected in tax returns filed after 2006.  The court gives very little weight to either of the Plaintiff's arguments.  First, the Plaintiff did not establish that either stock produced dividend income in 2005.  Second, the Plaintiff did not establish that the sale or disposition of either stock should have been reflected in the Debtor's tax returns and, if so, in what manner.  The Plaintiff's documentary evidence on these points is no more reliable than

the Debtor's memory.  The court finds that the Debtor's statements regarding ownership of the DTE and Consumer stock were not materially false.

The veracity of the Debtor's statements about his ownership of a phantom stock interest in Commercial Tool & Die, both in the November 2006 PFS and in the subsequent email communications with the Bank, presents the closest question.  The evidence on this point was conflicting.  The Debtor testified that his predecessor at Commercial, Denni Melinn, was given a phantom stock interest in the company which ultimately resulted in Melinn receiving nearly a million dollars upon his departure from the company.  The Debtor emphatically stated that both Melinn and Doug Bouwman, the owner of Commercial, promised him the same consideration.  Bouwman testified with equal confidence that no such promise was ever made to the Debtor.  He denied that the meetings referenced in the Debtor's September 2008 emails to WMCB occurred or were ever scheduled to occur.  Both versions of events are potentially credible.  However, given the lack of documentary evidence, and the Debtor's inability or unwillingness to enforce the alleged phantom stock agreement over the course of many years, the court concludes that the Debtor did not have an enforceable phantom stock interest in Commercial Tool & Die.  His representations to the contrary, in the PFS and the email communications, were false.  Because these misrepresentations caused the Debtor's liquid assets and overall net worth to be significantly overstated, they were also material.

*2.  Were the False Statements Reasonably Relied Upon by WMCB?*

The Sixth Circuit has previously described the "reasonable reliance" element of § 523(a)(2)(B) as one of two phrases in the statute which "may be said to constitute

31

causation requirements."[16]  Wolf v. Campbell (In re Campbell), 159 F.3d 963, 966 (6th Cir. 1998).  To meet the "reasonable reliance" requirement, the creditor must establish two separate, but related, elements:  first, that it actually relied on the alleged false statements; and second, that its reliance was reasonable.  National City Bank v. Plechaty (In re Plechaty), 213 B.R. 119, 126 (6th Cir. B.A.P. 1997).

Reasonable reliance is a more stringent standard that the justifiable reliance required to except debts from discharge for fraud under § 523(a)(2)(A).  Lamar, Archer & Cofrin, LLP v. Appling, __ U.S. __, 138 S. Ct. 1752, 1763 & n.6 (2018) (noting that the "text of § 523(a)(2)(B) plainly heightens the bar to discharge" for statements "respecting the debtor's financial condition" by not only requiring such statements to be made in writing, but also by requiring reasonable, rather than merely justifiable, reliance).  Even so, the reasonableness standard "cannot be said to be a rigorous requirement."  Bank One, Lexington, N.A. v. Woolum (In re Woolum), 979 F.2d 71, 76 (6th Cir. 1992) (noting that the standard is generally "directed at creditors acting in bad faith") (quoting Martin v.

---

[16]     The other "causation" requirement in § 523(a)(2)(B) is established by the introductory phrase that makes the debt nondischargeable only "to the extent [it was] obtained by" the intentionally false statements.  In re Campbell, 159 F.3d at 966.

At trial, counsel for the Debtor elicited testimony suggesting that the practical result of the $500,000 loan was the shifting of liability for obligations that already existed and that, in effect, only a small portion of the loan represented additional financial exposure for WMCB.  Thus, even if the other elements of § 523(a)(2)(B) are met, the Debtor argues that only $20,000 to $30,000 of the $500,000 represents new money "obtained by" the Debtor's alleged misrepresentations.

In Campbell, the Sixth Circuit declined to apply § 523(a)(2)(B)'s causation and damage requirements so narrowly.  The court held that a creditor who extends, renews or refinances an existing obligation based on false written representations by a debtor may establish that the entire debt is nondischargeable, even if the creditor is unable to show that the refinancing or forbearance resulted in additional damages.  Id. at 964.

Under Campbell, the Plaintiff need not show that WMCB incurred additional damages as a result of the $500,000 loan to meet its burden under § 523(a)(2)(B).  The Debtor's argument to the contrary is rejected.

Bank of Germantown (In re Martin), 761 F.2d 1163, 1166 (6th Cir. 1985)).   The Sixth

Circuit has also held that "[w]hether a creditor's reliance was reasonable is a factual

determination to be made in light of the totality of the circumstances."   BancBoston

Mortgage Corp. v. Ledford (In re Ledford), 970 F.2d 1556, 1560 (6th Cir. 1992) (citations

omitted); In re Plechaty, 213 B.R. at 126 (explaining that the focus of the inquiry is on the

creditor's decision-making process, but that the "actions and purposes of the debtor" may

also be relevant).   Among the factors to be considered are:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

In re Ledford, 970 F.2d at 1560 (citations omitted).

The $500,000 loan made by WMCB to the Debtor on September 30, 2008, has

been characterized by both parties in this adversary proceeding as an "emergency" loan.

At the time the loan was made, KCI was in serious financial trouble.   KCI's cash flow

issues were at a critical level, and its overdraft liability to WMCB exceeded $350,000.

The overdraft was a grave concern for the Bank, particularly as the end of the quarter

approached.   According to Berens, the Bank had determined that it would not extend

KCI's line of credit, nor would it call the loan and shut down KCI's operations.  The solution

to allow KCI to remain in business was execution of the $500,000 loan to the Debtor after

business hours on September 30, 2008.

The Bank's Emergency Loan Approval report summarizes the terms and

conditions of the $500,000 loan.   See Plf. Exh. 16; Dft. Exh. O.  It states that the loan is

33

to be secured by a junior mortgage on the Debtor's residence in Belmont, Michigan and supported by corporate guarantees from Krieger Craftsman, Inc. and Krieger LLC, not to exceed $400,000 each.  The report indicates that an updated PFS is required from the Debtor, but states that it is not needed prior to closing.  The loan approval report lists three sources from which the loan is to be repaid:  "Cash flow from operations," "Liquidation of collateral," and "Enforcement of Guarantees."  At trial, Berens provided conflicting testimony on the meaning of these terms.

Concerning "cash flow from operations," Berens acknowledged that the phrase typically means money generated by a business – presumably KCI – but then continued to maintain that, in this instance, it really referred to the cash flow of the Debtor as the borrower.  The loan approval report does not support Berens' assertion.  The report includes detailed "as is" and historical cash flows for Krieger Craftsman, Inc., and Krieger LLC, including "cash flow available for debt service."  The loan approval report includes a section entitled "Financial Analysis" that discusses in detail how the Debtor had successfully restructured KCI's operations which could "be seen in the YTD numbers with solid profits and cash flow."  The report does include a page on the Debtor, summarizing his net worth and personal cash flow from income less taxes and debt service.  But nowhere in the report does it suggest that the loan would be repaid from the Debtor's income as opposed to KCI's cash flow.

Berens also acknowledged that collateral, in the Bank's parlance, would be "something that secures the indebtedness."  Here, the only collateral for the loan provided by the Debtor was the junior mortgage on the Belmont, Michigan real property.  The

34

collateral did not include any of the Debtor's personal property such as the DTE stock, the Consumer stock, or the Commercial Tool & Die phantom stock.

Under these circumstances, the court cannot conclude that WMCB actually relied on the representations in the November 2006 PFS or later email communications when it made the $500,000 emergency loan to the Debtor. First, the November 2006 PFS was completed nearly two years prior to the execution of the $500,000 loan. When asked about the purpose of the PFS, Jeffrey Berens did not know why the Bank had requested the statement. Although the Debtor checked a box at the top of the statement suggesting that the PFS was provided for the purpose of obtaining individual credit, he testified unequivocally and credibly that he was not seeking a loan from the Bank when the PFS was submitted. He explained that he filled it out quickly and from memory, as an accommodation to the Bank. When WMCB loaned the Debtor $100,000 in June 2008, it did not require an updated PFS prior to closing the loan. A couple of weeks later, the Bank specifically requested an updated statement from the Debtor. That information was not provided, and still the Bank took no action. When WMCB made the $500,000 loan to the Debtor on September 30, 2008, its internal documents again indicated that an updated PFS was needed, but the Bank did not require this documentation prior to closing the loan. Repayment of the loan was based solely on the operations and cash flow of KCI, not the Debtor. The only collateral given by the Debtor in connection with the loan was the second mortgage on his residence.[17]

---

[17]   Although the Bank may have relied on the PFS when it included the mortgage in the loan transaction, the Plaintiff has not alleged that the PFS contained any false statements about the home, its value, or any other encumbrances on the property.

35

Similarly, the court cannot conclude that WMCB relied on the Debtor's email representations about liquidation of the alleged Commercial Tool & Die phantom stock when making the $500,000 emergency loan.  The Debtor's statements in the emails dated September 10 and 16, 2008, referenced liquidation of the stock as one potential option for financing the Debtor's purchase of KCI.  The Debtor's emails also included statements about the difficulty he had in liquidating the stock, noting that there had been "many missed promises" on the issue.  The Bank was aware of these difficulties but did not require the issues to be resolved prior to making the $500,000 loan.  In fact, the loan was presumably made because the Debtor was not successful in obtaining the requisite cash from other sources.

Although the relevance of the Debtor's liquid assets, including the alleged Commercial stock, is not apparent from the terms of loan itself, the evidence and testimony at trial established that both the Debtor and the Bank expected the $500,000 loan to be a short-term arrangement pending the Debtor's ultimate purchase of KCI.  Liquidation of the Commercial stock was one option for financing that purchase.  However, even if the Bank relied on the statements in the outdated PFS and subsequent email communications – particularly those relating to the Commercial stock and its potential impact on the Debtor's ability to finance the purchase of KCI – in making the $500,000 loan, its reliance was not reasonable.  Throughout the Bank's relationship with the Debtor, there were several "red flags" indicating that the November 2006 PFS was not accurate.  For instance, inclusion of the Debtor's vehicle loans on the Bank's internal loan reports indicates that the Bank knew of these liabilities, even though they were not disclosed on the PFS.  The Emergency Loan Report for the $500,000 loan specifically

36

lists five different loan obligations, four designated as "Ford Motor – Auto" and one listed as "GMAC – Auto," among the Debtor's personal liabilities.  Another red flag was raised when the Debtor failed to provide the Bank with an updated PFS prior to closing the $500,000 loan, despite the Bank having requested that information on several occasions. More importantly, the Debtor's overall communications to the Bank disclosed that liquidation of the alleged phantom stock interest in Commercial Tool & Die had been a long and difficult process.  The length of time over which the discussions and missed promises occurred should have suggested to the Bank that realization of proceeds from this phantom stock interest was not a foregone conclusion.

Despite its knowledge that the PFS was nearly two years old, that it contained inaccuracies, that the liquidation of the Debtor's Commercial stock had not occurred, and that that purchase of KCI had been anticipated for years but never came to fruition, the Bank did not do any additional investigation prior to making the $500,000 loan.  It requested updated financial statements from the Debtor but did not insist that they be provided prior to closing the loan.  If the Bank was indeed relying on the November 2006 PFS and the Debtor's representations about the Commercial stock, as the Plaintiff has alleged, sufficient red flags were raised about the accuracy of the PFS and the viability of the alleged stock interest to warrant more investigation by the Bank before it made the emergency $500,000 loan.  Under the totality of the circumstances, the Bank's reliance on the PFS and subsequent email communications was not reasonable.

When the Bank made the $500,000 emergency loan to the Debtor it was backed into a financial corner with few options for getting out prior to the end of its quarter. Despite its knowledge of the problems the Debtor had encountered with liquidating his

37

supposed Commercial Tool & Die stock and without having an updated PFS on file, it made a $500,000 personal loan to the Debtor to allow him to infuse capital into a company he did not own.  The loan transaction benefitted the Bank in several ways: it cured the KCI overdraft liability before the end of the quarter, resulted in corporate guarantees, and allowed the Bank to obtain a second mortgage on the Debtor's home.  The court finds that, from the Bank's perspective, these benefits outweighed the obvious risks that the Debtor's financial information was out of date or that he would ultimately be unable to finance the purchase of the business.  The Bank saw the red flags and determined to make the loan anyway.  Therefore, to the extent the Debtor made false statements to WMCB, the court concludes that the Bank did not reasonably rely on those false statements in making the loan.

       3.    *Did the Debtor Make the Statements with the Intent to Deceive WMCB?*

The creditor may satisfy § 523(a)(2)(B)(iv)'s intent requirement by showing that the debtor made false written statements with the intent to deceive the creditor or with gross recklessness as to the truth of such statements.  Bank One, Lexington, N.A. v. Woolum (In re Woolum), 979 F.2d 71, 74 (6th Cir. 1992).  In this case, the Plaintiff has not established that the Debtor acted with the requisite intent or gross recklessness in making the alleged false statements.

The Debtor testified that he understood that he was providing the November 2006 PFS as an accommodation to the Bank.  He filled it out quickly from memory.  At that time, he was not seeking a loan from the Bank.  He also testified credibly that when he completed the PFS, he had the subjective belief that he owned the assets listed and that the liabilities (with the possible exception of the vehicle loans which later became known

38

to the Bank, and the debt to his parents, the amount of which is unknown) were reasonably accurate. Even if the Debtor knew or should have known that his statements about the vehicle liabilities, debt to his parents, or the Metal Masters receivable were inaccurate, the assertion that the Debtor made these representations with the intent to deceive the Bank into making him a loan nearly two years later strains credulity.

Because of the on-going nature of the representations about the Commercial Tool & Die stock, the Debtor's statements about this potential asset on the November 2006 PFS and in the subsequent emails present a closer question. Again, the Debtor testified that he believed he was entitled to the Commercial Tool & Die phantom stock when he completed the PFS, when he emailed the Bank in mid-September 2008, and that his belief continues to this day. The Debtor's testimony on these points was specific and credible, and no countervailing evidence was presented. As a result, the court cannot conclude that the Debtor's belief in his entitlement to the Commercial stock was unreasonable or entirely implausible at the time the PFS was completed or when the email representations were made. Because of the Debtor's subjective belief in his entitlement to the Commercial stock, his disclosure of the difficulties he had encountered in liquidating the stock, and the fact that liquidation of the stock was one of many options the Debtor discussed with the Bank for raising capital to fund his purchase of KCI, the court finds that the representations in the emails were not made with the intent to deceive the Bank or with gross recklessness as to their truth.

Overall, the Debtor may have had a practical interest in KCI continuing to operate when the $500,000 loan was executed. But taking a $500,000 personal loan to infuse cash into a company he did not yet have an ownership interest in was a poor financial

decision for the Debtor.   The court simply cannot find that the Debtor made false statements in a PFS completed nearly two years prior to the loan in question or in the two subsequent emails with the intent of tricking the Bank into a loan transaction which was, for the Debtor, a bad deal.  Likewise, considering the overall circumstances under which they were made, the court does not find that the statements in the PFS or the subsequent emails were made with gross recklessness as to their truth.

Because the Plaintiff has failed to establish the reliance and intent elements of its § 523(a)(2)(B) claim, that count of its complaint shall be dismissed for no cause of action.

B. § 727(a)(5) – Failure to Explain Loss or Deficiency of Assets.

In addition to its argument that the judgment debt should be excepted from discharge, the Plaintiff has also argued that the Debtor should be denied a discharge under three subsections of § 727.  First, the Plaintiff asserts that the Debtor has failed to adequately explain the dissipation of his significant prepetition income under § 727(a)(5).

Section 727(a)(5) provides that the court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."   11 U.S.C. § 727(a)(5).  "There are two stages of proof with respect to § 727(a)(5)." Strzesynski v. Devaul (In re Devaul), 318 B.R. 824, 839 (Bankr. N.D. Ohio 2004) (citation omitted).  First, the Plaintiff must establish that the debtor had a cognizable ownership interest in a specific asset, and that the debtor's interest existed at a time not too far removed from when the petition was filed.  Kovacs v. McVay (In re McVay), 363 B.R. 824, 831 (Bankr. N.D. Ohio 2006) (describing the creditor's "initial burden").  "The

burden then shifts to the debtor to satisfactorily explain the loss or deficiency of assets." In re Devaul, 318 B.R. at 839.

The determination of what "constitutes a 'satisfactory' explanation for purposes of § 727(a)(5) is left to the discretion of the [trial] court." Harrington v. Simmons (In re Simmons), 525 B.R. 543, 548 (1st Cir. B.A.P. 2015), aff'd, 810 F.3d 852 (1st Cir. 2016) (citations omitted). "When deciding whether a debtor's explanation is satisfactory, 'the issue is whether the explanation satisfactorily describes what happened to assets; not whether what happened to assets was proper.'" Clippard v. Jarrett (In re Jarrett), 417 B.R. 896, 905-06 (Bankr. W.D. Tenn. 2009) (citations omitted); see also In re McVay, 363 B.R. at 830-31 ("[I]t does not matter under § 727(a)(5) how the loss or deficiency occurred. For example, money spent on illegal activities does not run afoul of § 727(a)(5). Section 727(a)(5) is simply concerned with the adequacy of the debtor's explanation."). "The debtor's explanation must be reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went." In re Devaul, 318 B.R. at 839 (citations omitted). "The debtor's account need not be 'far-reaching and comprehensive,' but it must be more than a 'vague, indefinite, and uncorroborated hodgepodge of financial transactions.'" Schechter v. Hansen (In re Hansen), 325 B.R. 746, 763 (Bankr. N.D. Ill. 2005) (citations omitted).

When determining whether a debtor's explanation is "satisfactory," many courts have held that the presence or lack of supporting documentation is relevant to the credibility of any explanation offered, but most courts have declined "to hold that an explanation must always be supported by records to be satisfactory." In re Devaul, 318 B.R. at 839 (citations omitted); Pereira v. Young (In re Young), 346 B.R. 597, 619 (Bankr.

41

E.D.N.Y. 2006) (citing First Am. Bank of New York v. Bodenstein (In re Bodenstein), 168 B.R. 23, 34 (Bankr. E.D.N.Y. 1994) ("In this Court's view, the preferable rule would not mandate denial of discharge for failure to produce corroborating papers where the debtor's testimonial explanation bears sufficient credibility.") (citations omitted); but see Clean Cut Tree Serv., Inc. v. Costello (In re Costello), 299 B.R. 882, 901 (Bankr. N.D. Ill. 2003) (stating that a debtor's explanation under § 727(a)(5) "must be substantiated by documentation").  The court may also "consider such things as the nature of [the] debtor's business, as well as his education and financial and business sophistication" when assessing whether the explanation offered is satisfactory.  In re Devaul, 318 B.R. at 840. In sum,

> The word "satisfactorily," . . . may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that [it] believes the explanation – [the court] believes what the debtors say with reference to the disappearance or the shortage . . . . [It] no longer wonders.  [It] is contented.

In re Devaul, 318 B.R. at 840 (quoting Beneficial Mortgage Co. v. Craig (In re Craig), 140 B.R. 454, 459 (Bankr. N.D. Ohio 1992)) (additional citations omitted).

In this case, the Plaintiff's primary argument is that the Debtor has admitted to having significant cash assets from his personal income in the years leading up to his bankruptcy filing but has failed to adequately explain what happened to those assets.[18] The Plaintiff specifically focuses on the two and one-half years preceding the filing of the

---

[18]    On summary judgment, the Plaintiff also alleged that the Debtor failed to account for the disposition of the $100,000 in personal property that was disclosed on the November 2006 Personal Financial Statement provided to WMCB.  At trial, the Debtor gave a credible explanation regarding the liquidation of these assets (see Tr. at 162), and the Plaintiff did not address that argument in its post-trial brief.

Debtor's bankruptcy case.  During this time period, the Debtor's SOFA establishes that the Debtor had income of $208,000 for 2013 and 2014, and a year to date income of $170,000 for 2015.  The Debtor's testimony also establishes that the Debtor earned this prepetition income and consistently converted it to cash to pay general living expenses. The court finds that the Plaintiff has met its initial burden of showing that the Debtor's income constitutes an asset for which the Debtor must account.[19]

Whether the Debtor has presented a satisfactory explanation for what happened to his income in the years leading up to his bankruptcy filing is a much closer question in this case.  Certainly, the Debtor did not provide detailed records accounting for every dollar spent prepetition.  In large part, the reason for this appears to be that the Debtor did not have detailed records showing where the money was spent.  Although it may be unwise, or at least inefficient, to operate on a "cash basis," the Debtor gave specific, credible testimony that this is how he handled his finances for much of the prepetition period.  The Plaintiff did not refute that testimony.  The Plaintiff has suggested that the Debtor is too sophisticated for his failure to provide more detailed records to be deemed credible.  The court disagrees.  Despite the Debtor's apparent skill as a machinist, he has not proven himself to be a sophisticated businessman or particularly astute when it comes to handling his personal finances.  Frankly, when the Debtor agreed to be personally liable

---

[19]   The court notes that a debtor's prepetition income is generally considered an "asset" for purposes of § 727(a)(5).  See, e.g., Harrington v. Simmons (In re Simmons), 810 F.3d 852, 860 (1st Cir. 2016) ("[I]f the party seeking to thwart a discharge shows that the debtor has not accounted for previously owned assets *or previously earned income*, the burden shifts to the debtor to explain the deficiency.") (emphasis added); Apartments at Cambridge Co. v. Lewiston (In re Lewiston), 537 B.R. 808, 844-46 (Bankr. E.D. Mich. 2015) (analyzing alleged dissipation of assets, including debtor's income).  The Debtor has not argued to the contrary.

for a $100,000 loan, and then a $500,000 loan, from WMCB, the proceeds of which were intended and used for KCI obligations, he had no interest in KCI and only ongoing discussions with Tim Krieger and WMCB about becoming an owner of KCI.  He not only agreed to repay WMCB, but also mortgaged his home as security for the $500,000 loan. He was not indemnified by Tim Krieger or KCI for the loan.  Entering into such a transaction belies any notion that the Debtor is a sophisticated business person.

Instead of detailed financial records, the Debtor offered a summary exhibit, Defendant's Exhibit CC, to illustrate how his prepetition income was spent.  Unlike the Plaintiff, the Debtor focused on a much longer time frame – approximately ten years prepetition – when explaining his expenditures.  The expenses listed on Exhibit CC corroborate the Debtor's testimony that nearly every dollar that the Debtor earned was spent on living expenses for the Debtor, his wife, and his children.  At the low end, the expenses listed on Exhibit CC demonstrate that the Debtor was consistently spending over $150,000 a year, not counting items that he paid for his children.  At the high end, the expenses total nearly $200,000.  Based on the Debtor's testimony about his prepetition spending habits, the court concludes that the higher estimate of the Debtor's expenses is likely more accurate.  When variable expenses such as repayment of the Team Financial loan, educational and living expenses for the children, and weddings are included, it is easy to conclude that the Debtor was spending every penny – and maybe more – of the money he brought in.

Notably, the Plaintiff stipulated to the admission of Exhibit CC into evidence.  The Plaintiff was successful in showing that not all of the listed expenses persisted throughout the entire prepetition period and that the Debtor could not provide documentation for the

children's college, wedding, and car expenses, travel expenses, and the Team Financial loan and payments.  However, the Plaintiff was not able to demonstrate that any of the information on the exhibit was inaccurate.  Further, the Plaintiff did not suggest, much less prove, that the Debtor had concealed his income or otherwise attempted to hide it from creditors.  To the contrary, the evidence presented at trial suggested that the Debtor had been forthcoming about his spending throughout the bankruptcy process.

The court agrees with those courts which have concluded that a debtor's explanation does not necessarily require that it always be supported by records.  The Debtor's testimony and Exhibit CC provide a satisfactory and reasonable explanation of the disposition of the Debtor's income.  On balance, the court is persuaded by the Debtor's explanation of how his prepetition income was spent.  The Plaintiff's § 727(a)(5) claim will be dismissed for no cause of action.

C.  § 727(a)(2)(A) – Transfer or Concealment of Assets.

In a somewhat related argument, the Plaintiff asserts that the Debtor should be denied a discharge because his choice to operate on a cash basis concealed the disposition of assets from creditors and hampered the Plaintiff's ability to collect from those assets.  Section 727(a)(2)(A) provides:

(a) The court shall grant the debtor a discharge, unless –

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> > (A) property of the debtor, within one year before the date of the filing of the petition . . . .

45

11 U.S.C. § 727(a)(2)(A).  The Sixth Circuit has stated that "[t]his section encompasses two elements: (1) a disposition of property, such as concealment, and (2) a 'subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property.'"  Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (quoting Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997)).

As explained by the Sixth Circuit Bankruptcy Appellate Panel, the Keeney formulation of the first element of the test, which links concealment to disposition of property, is "simply recognition that concealment allegations typically arise in the context of a debtor who transferred title to property in order to hinder, delay, or defraud a creditor while retaining some benefit of ownership."  Buckeye Retirement Co. v. Swegan (In re Swegan), 383 B.R. 646, 654 (6th Cir. B.A.P. 2008) (citations omitted).  In the absence of a transfer of property, concealment may include "withholding of knowledge or information required by law to be made known."  Id. (citations omitted).  The requisite intent may be established by circumstantial evidence, including various "badges of fraud."  Jahn v. Flemings (In re Flemings), 433 B.R. 230, 236 (Bankr. E.D. Tenn. 2010) (listing eight badges of fraud that may provide indicia of fraudulent intent when property is transferred) (citation omitted); see also Branch Banking & Trust Co. v. Evans (In re Evans), 538 B.R. 268, 285-86 (Bankr. E.D. Va. 2015) (noting that the "conventional badges of fraud do not logically apply to a debtor discreetly retaining possession of, instead of transferring, his or her interest in property;" instead, courts may consider other evidence such as "the debtor's sophistication to appreciate his responsibility to disclose his assets," whether he is represented by counsel, whether there are an "inordinately high number of omissions," and whether the debtor has displayed a "pattern of reckless behavior toward his duties to

46

the court") (citing Wachovia Bank, N.A. v. Voccia (In re Voccia), 477 B.R. 625, 633-35 (Bankr. E.D. Va. 2011)).

In the present case, the Plaintiff has not alleged that the Debtor transferred property while maintaining the benefits of ownership or concealing the transaction from creditors. Nor has the Plaintiff asserted that the Debtor "concealed information that was required by law to be made known." Instead, the Plaintiff more generally alleges that by transacting his personal financial business using only cash, the Debtor effectively concealed his assets and spending from creditors. Even if operating on a cash basis could constitute concealment in appropriate circumstances, there is no evidence that the Debtor in this case was using cash for the purpose of hindering, delaying, or defrauding his creditors. The Debtor testified that he switched to using cash to avoid bouncing checks and incurring fees after his checking account was garnished. Again, the court questions the objective validity of this reasoning and the efficiency of handling one's personal finances in this manner. But the Debtor's testimony regarding his subjective motivations was credible and unrefuted. Based on that testimony, and the record as a whole, the court cannot conclude that the Debtor was operating on a cash basis or otherwise concealing assets with the intent to harm his creditors.

There is no basis for denying the Debtor's discharge based on his intentional concealment of assets. The Plaintiff's § 727(a)(2)(A) count shall be dismissed for no cause of action.

47

D.  § 727(a)(4)(A) – False Oath or Account.

Section 727(a)(4)(A) provides that a debtor's discharge may be denied if he knowingly and fraudulently makes a false oath or account in connection with the case. To prevail under § 727(a)(4)(A), the Plaintiff must establish five elements:

> (1) the debtor made a statement under oath;
>
> (2) the statement was false;
>
> (3) the debtor knew the statement was false;
>
> (4) the debtor made the statement with fraudulent intent; and
>
> (5) the statement related materially to the bankruptcy case.

Keeney v. Smith (In re Keeney), 227 F.3d 679, 685 (6th Cir. 2000) (citing Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992)).  "Whether a debtor has made a false oath under section 727(a)(4)(A) is a question of fact." Id. (citing Williamson v. Fireman's Fund Ins. Co., 828 F.2d 249, 251 (4th Cir. 1987)).

The Plaintiff asserts that the Debtor knowingly made several misrepresentations in his bankruptcy schedules and SOFA with the intent to mislead creditors.  First, the Plaintiff argues that the Debtor misstated his 2013 and 2014 income on his SOFA, because his income tax returns show higher gross income for those years.  As the court noted previously,[20] the Debtor explained that he calculated his income for purposes of the SOFA by multiplying his weekly income of $4,000 per week to arrive at an annualized figure.  The court credits this explanation.  The Debtor did not make a material misrepresentation regarding his income on the SOFA.

---

[20]   See note 9 supra.

Second, the Plaintiff asserts that the Debtor failed to list several transfers on his SOFA, particularly in response to Question 10, which requires disclosure of transfers made within two years of the petition date, other than those made "in the ordinary course of the business or financial affairs of the debtor." According to the Plaintiff, the Debtor should have disclosed the prepetition sale of various items personal property, including his snowblower and lawn mowers, payment of his youngest son's education, car, and living expenses, payments for the Hawaiian wedding, the $400 per week he gave his wife for incidental expenses, and the payments for his wife's trips to California in response to Question 10. The Debtor argues that no disclosure was required because these payments were made in the ordinary course of his financial affairs.

As one court has noted, "[n]either the SOFA nor the Bankruptcy Code define the phrase 'in the ordinary course of business or financial affairs' with respect to Question 10." Stamat v. Neary, 635 F.3d 974, 980 (7th Cir. 2011). However, when determining the "ordinary" nature of other types of transactions, courts have considered various factors, including the "history of dealing between the parties," to determine whether a particular payment was a "customary or regularly occurring one." Id. In this case, it is clear that the payments made by the Debtor to and for his children and wife were made in the ordinary course of the Debtor's financial affairs. The Debtor's unrefuted testimony established that he consistently paid educational and living expenses for his children, provided spending money to his wife, and paid for her to travel to California. Even the Hawaiian wedding, which was a more unusual and extravagant expense, was consistent with the Debtor's prior practice of assisting his children with such expenses. The way the payments were made – incrementally, in cash, and upon request by the Debtor's wife –

49

were particularly consistent with how the Debtor ordinarily conducted his financial affairs. Even if the transfers to the Debtor's wife and children should have been disclosed on the Debtor's SOFA as having been made outside of the ordinary course of business, there was no evidence that such omissions were intended to deceive creditors.

The court agrees with the Plaintiff that the sale of the snowblower, televisions, furniture, and yard and lawn equipment were not in the ordinary course of business or financial affairs of the Debtor, and therefore should have been listed on the Debtor's SOFA. But again, there was no evidence that the Debtor's failure to list these transfers was intended to deceive his creditors.

Finally, the Plaintiff argues that the Debtor's disclosures regarding the Team Financial debt, and the related loan of the proceeds to the Debtor's son, may have been inaccurate. Based on the original amount of the Team Financial loan, $35,000, the amount of the Debtor's monthly payments, approximately $1,600, and the $9,200 balance remaining at the time the case was filed, the Plaintiff suggests that the obligation and loan to the Debtor's son "could very easily" have been made in the two years prior to the petition date. See Plaintiff's Post Trial Brief, at p. 52-53. The court is troubled by the omissions regarding this obligation and the lack of specificity provided by the Debtor with regard to the timing of the transaction. The court notes, however, that the prepetition payments to Team Financial were disclosed on the SOFA. And the loan to the Debtor's son was also referenced in a notation made on the SOFA. The Debtor's testimony, which was unrefuted, was consistent with the representations on the SOFA that the loan to his son was more than two years old and was uncollectable. Under the circumstances, the

50

court does not find that the Debtor made material misrepresentations regarding the Team Financial obligation or the loan to his son with the intent to deceive his creditors.

The Plaintiff has not established that the Debtor knowingly and fraudulently made a false oath in this bankruptcy case and the § 727(a)(4) count will be dismissed for no cause of action.

## V.    CONCLUSION.

Christopher Ostosh is hardly a sympathetic debtor.  He historically and currently earns an income that places him in or near the top five percent of the country's wage earners.  Prior to his bankruptcy filing, he entered into myriad poor business transactions, particularly with respect to WMCB, and burned through his sizable income by doting on his children and otherwise living beyond his means.  Because Mr. Ostosh's debts are not primarily consumer debts, his sizeable income does not disqualify him from being a chapter 7 debtor pursuant to § 707(b), nor did any party request his case be dismissed under § 707(a).  But while not a sympathetic debtor, the Plaintiff has failed to prove that Mr. Ostosh is a dishonest debtor.  The court cannot conclude that Mr. Ostosh defrauded WMCB or acted in contravention of 11 U.S.C. § 727.  Accordingly, a separate judgment dismissing KCI's claims against the Debtor shall be entered.

**IT IS SO ORDERED.**

**Dated September 20, 2018**





James W. Boyd
United States Bankruptcy Judge