UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:  CHRISTOPHER J. OSTOSH,

       Debtor.

_____/

KRIEGER CRAFTSMEN, INC.,

       Appellant / Plaintiff,

                    CASE No. 1:18-CV-1143

v.

                    HON. ROBERT J. JONKER

CHRISTOPHER J. OSTOSH,

       Appellee / Defendant.

_____/

## OPINION AND ORDER AFFIRMING BANKRUPTCY COURT'S DECISION

### INTRODUCTION

This is an appeal from a decision of the Bankruptcy Court in favor of Appellee Christopher J. Ostosh ("Ostosh"), who is also the Debtor.  The underlying adversary proceeding involved a four-day trial in front of the Bankruptcy Court.  Krieger Craftsmen, Inc. ("KCI") sued to deny Ostosh a discharge under 11 U.S.C. § 727(a) or alternatively to except a judgment debt it holds under § 523(a).  The debt at issue arose out of a $500,000 personal loan Ostosh took out in September of 2008 from KCI's bank lender to cover, among other things, more than $350,000 in account overdrafts that KCI itself could not cover at the time.  KCI later fired Ostosh, and Ostosh defaulted on the bank loan.  The bank obtained a judgment, which it ultimately assigned to KCI.

The Bankruptcy Court issued a written opinion after trial denying all four counts in KCI's complaint.  KCI appeals the Bankruptcy Court's decision with respect to two of those counts. The matter has been fully briefed and is ready for decision.  After careful review of the record, the

Court considers oral argument unnecessary in order to resolve the motion. *See* W.D. MICH. LCIVR 7.2(d). Because the Bankruptcy Court's findings of fact are not clearly erroneous and its legal conclusions, on *de novo* review, are legally proper, the decision of the Bankruptcy Court is **AFFIRMED.**

## TRIAL TESTIMONY

The Bankruptcy Court heard testimony from four witnesses: The Debtor (Ostosh); Ostosh's wife Lynda; Jeffrey Berens, the Executive Vice President and Chief Lending Officer of West Michigan Community Bank ("WMCB"); and Doug Bouwman, Chief Executive Officer and Shareholder for Commercial Tool & Die.[1]

1. *Ostosh's Early Career*

Ostosh testified that he graduated from high school in 1981. (Tr. at 19, PageID.1030). Thereafter he went to Macomb Community College, majoring in mechanical engineering. (Tr. at 19-20, PageID.1030-1031). He did not graduate. He is married, with three children, born in 1986, 1987 and 1990. (Tr. at 20, PageID.1031).

In the early 1980s, Ostosh started his own mold machining business, Metal Masters, using his savings, and loans from his family. (Tr. at 24-26, PageID.1035-1037). Ostosh described Metal Masters as a successful business and through it he developed several customer contacts that helped him later on in his consulting career. Ostosh sold Metal Masters for approximately $3 or $ 4 million in the late 1990s. At least part of the reason he sold the business was because some of Ostosh's clients failed to pay their accounts, and he wanted to move to the next level, where he would be able to have secured interests and reach customers who were more reliable. (Tr. at 33, PageID.1044). After selling Metal Masters, Ostosh invested in Corver Engineering, which was

---

[1] The complete transcript of the trial is available at ECF No. 7-9, PageID.1012-1611.

owned by a former customer of his.  (Tr. 32-33, PageID.1043-1044).    Based on disagreements

with the owners, however, Ostosh withdrew his interest from the company only fifteen months

after investing.  (Tr. at 35, PageID.1046).  He netted nothing out of the deal.

    *2.  Ostosh Consults at Commercial Tool & Die*

    Shortly after leaving Corver, Ostosh was approached by another one of his former Metal

Masters customers, Doug Bouwman, who asked whether Ostosh would work as a consultant for

Bouwman's company, Commercial Tool & Die.  (Tr. 35-36, PageID.1046-1047).  Ostosh agreed

and joined on as a consultant.

    Bouwman testified that he hired Ostosh to help research and purchase equipment.  (Tr. at

410, PageID.1421).  Ostosh described his initial role a little differently, and that he conducted "an

overall assessment of [Bouwman's] company, and where we could improve and augment

efficiencies and gut out costs[.]"  (Tr. at 37, PageID.1048).  Within a year and a half, Bouwman

promoted Ostosh to president of the whole tooling group.  (Tr. at 478, PageID.1489).  Ostosh said

he took the reins of running the full company because Bouwman was an absentee owner.  (Tr. at

480, PageID.1491).  By February 2005, Ostosh had taken the company from $10 or $15 million in

yearly sales to $33 million sales.  That month, however, Bouwman asked Ostosh to take a 50%

pay cut because he believed the company had reached a plateau in sales.  Ostosh refused, and

Bouwman terminated Ostosh's employment.  (Tr. at 480-81, PageID.1491-1492).

    According to Ostosh, when was terminated, he had 1,650 shares of phantom stock in

Commercial Tool & Die, which he would later value at $650,000.  (Tr. at 85, PageID.1097).

Ostosh testified that all the other managers had similar arrangements.  (Tr. at 88, PageID.1099).

Ostosh demanded that he be given the stock when he was terminated, but he was not given it.

Doug Bouwman testified, however, that he never had any communication with Ostosh about

3

phantom stock (Tr. at 44, PageID.1425) and that when he was terminated, Ostosh never had any ownership interest in Commercial Tool & Die.  (Tr. at 412, PageID.1423).

   *3.  Ostosh Consults at Plaintiff KCI*

      In December 2005, about ten months after Ostosh left Commercial Tool & Die, Tim Krieger, the owner of KCI, called Ostosh and asked if he would be willing to do some consulting work for the company.  (Tr. at 482, PageID.1493).  Ostosh agreed and began his consulting in January 2006.

      According to Ostosh, KCI was struggling as a business.  When Ostosh arrived as a consultant, KCI had a credit line of $745,000 and had an outstanding balance of more than $500,000 with its account at West Michigan Community Bank (WMCB).  Ostosh began his consulting work by performing an assessment of the employees and recommending that KCI fire half its staff as a way to improve operations.  (Tr. at 484-85, PageID.1495-96).

      Ostosh testified that he was able to improve KCI's sales but as sales volume increased, there was a need for more material and wages.  In other words, KCI needed to spend money in order to make money.  Thus throughout the next year, KCI's outstanding balance continued to grow and often bumped up against its $750,000 credit limit at WMCB.  (Tr. at 494, PageID.1505).

   *4.  Krieger Discusses a Purchase of KCI by Ostosh with Third Parties*

      According to Ostosh, from "month one," that is January 2006, Krieger spoke with Ostosh about becoming a partner, or part owner, of KCI.  (Tr. at 487, PageID.1498).  Ostosh testified that he was not interested in forming a partnership with Krieger because the company was undercapitalized.  Nevertheless, Krieger continued to pursue the possibility, and Krieger spoke to others about Ostosh obtaining an interest in KCI.  One of those individuals Krieger spoke to about

Ostosh taking over was Jeremy Deutschmann, a chief lending officer at WMCB.  (Tr. at 496, PageID.1507).

5.   *Ostosh Completes a Personal Financial Statement and Expands his Role at KCI*

In light of Krieger's expressed interest, Jeremy Deutschmann asked Ostosh to fill out a Personal Financial Statement (PFS).  (Tr. at 460, PageID.1471; 496, PageID.1507).  Ostosh testified he was not seeking a loan at the time, and so he filled the PFS out only as an "accommodation" given the conversations Krieger had had with the bank about Ostosh taking over. (Tr. at 496, PageID.1507).  Ostosh completed the PFS on November 27, 2006.  Among other things, Ostosh listed 1,650 shares of stock at Commercial Tool & Die as an asset on the PFS.  (ECF No. 12-1, PageID.1849).   Ostosh testified that he filled the PFS out in twenty minutes based only on his memory (Tr. at 460, PageID.1471).  He later described it as a "cursory exercise."  (Tr. at 503, PageID.1514).

Time passed, and Ostosh continued as a consultant while Krieger was responsible for bringing in new customers.  Ostosh testified that Krieger was not successful at bringing in new business, and sales began to dry up.  So, sometime in 2007, Ostosh took on some additional responsibilities, including soliciting new customers.   Ostosh reached out to some of his business contacts and started procuring work for KCI.  (Tr. at 508, PageID.1519).  His efforts resulted in almost an immediate effect with increased sales.  KCI employees worked 70 to 90 hours a week to keep up.  (Tr. at 509, PageID.1520).

But this new business caused KCI's working capital to dry up for the same reason it had been reduced earlier—increased overtime and labor as well as increased material needs.  (Tr. at 511, PageID.1522).  KCI's $745,000 credit line at WMCB was tapped out in September 2007. (*Id.*).  On December 4, 2007, Jeremy Deutschmann sent Ostosh and Krieger an e-mail stating that

year to date, KCI had been overdrawn 145 out of 337 days on its checking account, and that the overdrafts were not acceptable to the bank. (ECF No. 7-6, PageID.606). Over the next few days the bank told Krieger and Ostosh that it would not cover any additional overdrafts, however the issues with over drafts continued into the following year.

   6.  *Ostosh, Krieger and WMCB Discuss Ostosh's Purchase of KCI*

In fact, KCI's overdraft balance at WMCB continued to grow, and on April 23, 2008, WMCB asked KCI to move its business elsewhere. (Tr. at 294, PageID.1305). As Ostosh put it in his brief, "discussion then began in earnest about Ostosh buying KCI from [Tim] Krieger outright." (ECF No. 15, PageID.1891).

Indeed, WMCB's actions that spring indicate that it believed Ostosh's takeover was imminent. During this time, WCMB reached out to other investors to try to find support for Ostosh in his purchase attempt. (Tr. at 520, PageID.1531). Jeremy Deutschmann also approached Ostosh and proposed that WMCB loan him $100,000 which could be used to invest in KCI as part of a partnership / ownership bid. (Tr. at 513-514, PageID.1524-1525). Ostosh agreed, and the loan was executed on June 16, 2008. (ECF No. 16-3, PageID.1948). An updated PFS was requested, but the loan document stated that it was not necessary to close the loan. In fact, Ostosh never provided WMCB with an updated PFS.

At some point a letter of intent (that does not appear to be in the record) was signed between Krieger and Ostosh, but there was no sale of KCI that occurred around June 2008 (or anytime thereafter).

   7.  *WMCB Continues to Work with KCI and Ostosh*

As negotiations continued, the parties discussed various sources of capital, including from outside investors and from Ostosh's phantom stock interest, to support Ostosh's expected

purchase.  On September 9, 2018, Jeff Berens, another Chief Lending Officer at WMCB, asked Ostosh if he had received the funds from liquidating the stock. (ECF No. 7-9, PageID.942).  Ostosh replied that he was "at their mercy," but that he expected $400,000 on September 15.  Then on September 16, Ostosh e-mailed Jeff Berens and told him he had a meeting with Commercial Tool & Die later that day and hoped to collect his stock money then.  He noted that "I have many missed promises regarding this[.]" (ECF No. 7-9, PageID.940).  But Doug Bouwman testified that he had no meetings scheduled for the dates Ostosh mentioned, nor did he ever have any communications with Ostosh about any kind of stock.  (Tr. at 413-414, PageID.1424-1425).

Meanwhile KCI's overdraft balance on its account with WMCB continued to grow.  In August 2008, KCI's overdraft balance was close to $185,000.  (ECF No. 16-7, PageID.1960).  And by September 29, 2008, the overdraft had grown to $353,765.90.  (ECF No. 16-11, PageID.1976).  WMCB's quarter ended on September 30, 2018, at which point it would have to report the overdraft to the FDIC.  Jeff Berens testified that was something that WMCB would not want to do.  (Tr. at 355-356, PageID.1366-1367).  Ostosh testified that as the quarter neared to a close, WMCB told KCI that if it did not remedy the overdraft and get direction on the sale of the company, then WMCB would shut the company down.  Ostosh thought that closing KCI down would put WMCB "in a horrible position" (Tr. at 528, PageID.1539).

*8.  The September 2008 Emergency Loan*

Ultimately a solution was reached where KCI's liabilities on the overdrawn account were shifted over to Ostosh with an emergency loan.  Ostosh and his wife testified that on September 30, 2008, Ostosh executed an emergency loan with WMCB.  Both Ostosh and his wife testified that this happened after hours, and Mr. Berens testified that "it could have" been executed after hours. (Tr. at 355, PageID.1366).  The Bankruptcy Court summarized the emergency loan's provisions

as follows: "[u]nder the emergency agreement, [Ostosh] became personally liable on a $500,000 promissory note to the Bank. The Bank also received a second mortgage on the Debtor's home, along with guaranties from KCI and Krieger LLC, as additional collateral for the loan." (ECF No. 7-9, PageID.1741).

Like the earlier loan for $100,000.00, an additional term and condition in the emergency loan provided for "receipt of updated personal financial statement (not needed to close)." *Id.* Also like the $100,000 loan, no updated PFS was ever provided by Ostosh. The funds from the loan were used mainly to pay off the $350,000 overdraft as well as the $100,000 loan that Ostosh had earlier taken out. (ECF No. 16-11, PageID.1976). "The primary practical effect of the emergency loan was to shift liability for KCI's portion of the prior debt from KCI to [Ostosh] personally." (ECF No. 7-9, PageID.1742).

The expectation, as it was with the first $100,000 loan, was that the loan would be a temporary solution until Ostosh acquired KCI. Ostosh testified that the interest on the loan was exclusively paid for by KCI. (Tr. at 547, PageID.1558).

*9. Ostosh is Fired from KCI*

Ostosh testified that business at KCI had been going great, but shortly after the September loan the automakers declared bankruptcy which led to a drop in KCI's sales. Ostosh testified that he stopped getting paid his salary by KCI in March 2009. (Tr. at 463-464, PageID.1474-1475). On April 20, 2009, Krieger terminated Ostosh's employment. (Tr. at 143, PageID.1154).

Thereafter, Krieger and WMCB collected on KCI's accounts receivable. Ostosh testified that KCI and WCMB collected enough to pay off the full $745,000 line of credit that KCI had with WMCB, including the $527,000 balance that KCI had incurred before Ostosh arrived. Ostosh

requested that these funds be used to pay down the $500,000 promissory note, but KCI and Krieger did not do so.  (Tr. at 557-558, PageID.1568-1569).

### 10.  *Personal Finances*

After leaving KCI, Ostosh began working at Detail Technologies as its President, CEO, and Chairman of the Board.  His pay is similar to what he received at KCI, approximately $20,000 per month.  Ostosh admitted he has a very comfortable lifestyle.  He usually spends his pay as it comes in.  He has, in the past, provided a lot for his children and family.  (Tr. at 473, PageID.1484). These expenditures included paying tuition for his children at a private high school, and financing weddings, cars, and plane flights for his children.  During the trial, Ostosh testified that he began operating on a "cash basis" sometime between 2011 and 2013 after his checking account was garnished. (Tr. at 223-224, PageID.1234-1235).  Furthermore, at some point the family moved homes[2], and Ostosh testified "we certainly jettisoned a tremendous amount of built-up documentation" during the move.  (Tr. at 223, PageID.1234).  During trial the parties stipulated to a one-page exhibit listing Ostosh's expenditures.  The document stated that Ostosh's yearly expenditures were $127,200 on the low end and $146,200 on the high end, though neither amount included several other variable expenses.  (ECF No. 16-18, PageID.2014).

### 11.  *Pre-Bankruptcy Litigation*

Litigation in state court followed after Ostosh's termination from KCI.  In September 2009, WMCB sued Plaintiff for the $500,000 loan and obtained a judgment of $587,514.19 in its favor on December 6, 2010.  (Tr. at 149, PageID.1160).  That judgment debt was assigned to WMCB's parent company, and on July 1, 2014 the parent company assigned the judgment debt to KCI.

---

[2] Ostosh could not remember when this was.  It was "a couple years ago."  (Tr. at 754, PageID.1588).

(ECF No. 7-9, PageID.1744). Ostosh also sued KCI for unjust enrichment for failure to pay the $500,000 loan.  Arbitration was held in December 2013.  The arbitration resulted in a decision in Ostosh's favor in the amount of $195,091.00 (ECF No. 16-16, PageID.2005).

## PROCEDURAL HISTORY

On July 17, 2015, Ostosh filed a Chapter 7 petition in the Bankruptcy Court.  (ECF No. 7-2, PageID.71).  On March 2016, KCI, as holder of WMCB's judgment debt, brought an adversary proceeding seeking: (1) to except the  discharge of a judgment debt under 11 U.S.C. § 523(a)(2)(B) for use of materially false written financial statements which were intended to mislead; (2) to deny the discharge in its entirety under § 727(a)(2)(A) for transfer or concealment of assets, (3) to deny the discharge in its entirety under § 727(a)(4) for false oaths or accounts; and (4) to deny the discharge in its entirety under § 727(a)(5) for failure to explain loss.  (ECF No. 7-2, PageID.215-233).  The Bankruptcy Court denied the parties' cross motions for summary judgment from the bench on August 31, 2017.  (ECF No. 7-9, PageID.971-1000).  A *pro forma* order entered the same day.  (*Id.* at PageID.1001).

The case was tried before the Bankruptcy Court on February 20 & 21, 2018 and on April 9 & 10, 2018.  Following the close of proofs and arguments, the Bankruptcy Court issued a comprehensive decision on September 20, 2018 ruling against KCI's arguments.  (ECF No. 7-9, PageID.1728-1778).  An Order Dismissing KCI's Complaint for No Cause of Action entered the same day.  (ECF No. 7-2, PageID.50).

KCI filed a Notice of Appeal on October 3, 2018.  (ECF No. 7-2, PageID.32).  KCI has appealed Judge Boyd's decision with respect to two of the four claims: (1) whether the discharge should be denied in its entirety under § 727(a)(5) for failure to explain loss; and (2) whether the judgment debt should be excepted under §  523(a)(2)(B) for use of materially false financial

statements that were intended to mislead.  KCI filed a principal brief on December 31, 2018 (ECF No. 11).  Ostosh filed a responsive brief on February 6, 2019. (ECF No. 15).  KCI filed a reply brief on February 27, 2019 (ECF No. 19).

## LEGAL STANDARDS

### 1.  *Standard of Review*

With a final order of a bankruptcy court, the district court reviews conclusions of law *de novo* and upholds its findings of fact unless they are clearly erroneous.  *In re Made in Detroit, Inc.*, 414 F.3d 576, 580 (6th Cir. 2005); *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co.*, 100 F.3d 1214, 1216 (6th Cir. 1996).

### 2.  *Section 727(a)(5)*

Section 727(a)(5) provides for a denial of discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).  "[T]he critical question" under this section "is what constitutes a 'satisfactory explanation." CHARLES JORDAN TABB, THE LAW OF BANKRUPTCY § 10.8 (2d ed. 2009).  "The question of whether a debtor satisfactorily explains a loss of assets is a question of fact." *In re Jarrett*, 417 B.R. 896, 905 (Bankr. W.D. Tenn. 2009) (Kennedy, B.J.) (quoting *In re Chalik,* 748 F.2d 616, 619 (11th Cir. 1984) (citing *Shapiro & Ornish v. Holliday,* 37 F.2d 407, 407 (5th Cir. 1930)).

"[T]he party moving for the denial of discharge . . . has the initial burden to come forward with evidence which would tend to establish that a cause of action exists . . . .  In specific terms, this requires establishing that there exists the loss or the deficiency of a prepetition asset that could have been used to pay creditors." *In re Reed*, 310 B.R. 363, 369 (Bankr. N.D. Ohio 2004).  Once the initial burden has been satisfied, the burden shifts to the debtor to come forward with an

explanation that will satisfactorily explain the loss of the assets. *In re Devaul*, 318 B.R. 824, 839 (Bankr. N.D. Ohio 2004). "To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets." *Id.* (citation omitted). "At its root, a satisfactory explanation under § 727(a)(5) is one that is reasonable under the circumstances." *In re Reed*, 310 B.R. at 370 (citation omitted).

3. *Section 523(a)(2)(B)*

Section 523(a)(2)(B) provides that a discharge does not discharge any individual from any debt--

> (2) for money, property, services, or an extension, renewal, or financing of credit, to the extent obtained by –
>
> ***
>
> > (B)   use of a statement in writing –
> >
> > > (i)     that is materially false;
> > > (ii)    respecting the debtor's or an insider's financial condition;
> > > (iii)   on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > > (iv)    that the debtor caused to be made or published with intent to deceive[.]

Accordingly, "[a] debtor who receives a general discharge from his debts under § 727 still might not exit bankruptcy with a full financial fresh start in life. Specific debts may be excepted from the operation of the general discharge pursuant to § 523, leaving those creditors free to pursue collection from the debtor after bankruptcy." Tᴀʙʙ, *supra* at § 10.15.

**DISCUSSION**

### 1. *Section 727(a)(5)*

#### a. *Initial Burden*

The Bankruptcy Court determined that KCI had "met its initial burden of showing that [Ostosh's] income constitutes an asset for which [Ostosh] must account." (ECF No. 7-9, PageID.1770). The Court agrees. KCI focused on approximately $660,000 in salary and bonuses that Ostosh earned between 2013 and the first half of 2015. (ECF No. 11, PageID.1806). Ostosh argues in a conclusory fashion that he does not believe KCI presented any evidence of dissipation of these assets (ECF No. 15, PageID.1901), but as the Bankruptcy Court appropriately found, Ostosh's own testimony was that he took his income from Detail Technologies and converted it to cash to pay his living expenses. KCI met its initial burden by pointing to Ostosh's significant income, and then showing that he reported only nominal assets in his bankruptcy filing. *See In re Lewiston*, 537 B.R. 808, 844 (Bankr. E.D. Mich. 2015) (finding that an explanation for what became of debtor's pre-petition income was appropriate under Section 727(a)(5)).

#### b. *Satisfactory Explanation*

Accordingly, the burden shifted to Ostosh to provide a satisfactory explanation. The Bankruptcy Court concluded that Ostosh gave such an explanation. (ECF No. 7-9, PageID.1772). KCI argues that the Bankruptcy Court erred in this regard by: (1) requiring KCI to show that Ostosh had an intent to conceal his income; (2) failing to find Ostosh was a sophisticated business person; and (3) finding a satisfactory explanation despite a lack of documentation. The Court disagrees.

13

       *i.*      *The Bankruptcy Court Did Not Require KCI to Prove Intent*

"[T]he global purpose of § 727 is to relieve creditors from the burden of 'discovering' assets[.]" *In re Mezvinksy*, 265 B.R. 681, 690 (Bankr. E.D. Penn. Aug. 1, 2001). Accordingly, "§ 727(a)(5) includes no subjective element of proving wrongful scienter such as an intent to defraud or hinder creditors." *Id.* The Bankruptcy Court, however, did not impose such a requirement in evaluating whether Ostosh had provided a satisfactory explanation.

It is true that the Bankruptcy Court observed that KCI "did not suggest, much less prove, that the Debtor had concealed his income or otherwise attempted to hide it from creditors" (ECF No. 7-9, PageID.1772). But this was only after the Bankruptcy Court found that Ostosh had given specific and credible testimony that Ostosh was spending as much as, if not more than, he was bringing in. Read in context, the Bankruptcy Court found Ostosh's explanation to be a convincing accounting for the diminishment of his assets. After this determination, the Bankruptcy Court observed that KCI had not refuted the testimony. It was entirely permissible for the Bankruptcy Court to do so. "As long as the debtor's explanation is convincing *and not rebutted*, there is no need for documentary corroboration." *In re Jarett*, 417 B.R. 896, 905 (Bankr. W.D. Tenn. Oct. 21, 2009) (emphasis added) (citing *In re Cromer*, 214 B.R. 86, 97 (Bankr. E.D.N.Y. 1997); *see also In re Cacioli*, 463 F.3d 229 (2d Cir. 2006).

KCI's argument on this point is accordingly rejected.

       *ii.*     *The Bankruptcy Court Did Not Clearly Error in Determining that Ostosh was Not a Sophisticated Business Person.*

Next, KCI argues that the Bankruptcy Court should have concluded that Ostosh was a sophisticated business person. Upon review, the Court finds no clear error in this regard.

A sophisticated business person can be held to a higher standard of accountability and record keeping." *In re LeMieux*, No. 16-10211, 2017 WL 4325563, at *10 (Bankr. N.D. Cal.

Sept. 27, 2017) (Blumenstiel, B.J.).  The record shows that Ostosh was knowledgeable about the mechanics of the specific tool and die industry; he had knowhow both about machines and about developing customer relationships.  But the record also shows Ostosh was not well-informed about finances and the business of running those companies. Indeed, as the Bankruptcy Court remarked, Ostosh's decision to assume KCI's liabilities without having taking ownership of the company shows he was not overly skilled in the world of business.

KCI argues that one bad decision does not erase decades of successful business practice. But the record is not nearly as one-sided as KCI makes it appear.  To be sure, Ostosh successfully generated significant personal income year after year.  But he also had difficulties with getting his customers to pay their accounts.  Then Ostosh decided to invest in a company without, as he admitted, doing due diligence into how it was being run.  He left only 15 months later without netting any profit.  He then began a consulting career where the record consistently shows that Ostosh dealt mostly with how the production got out the door, or how new business walked through the door, and not on the financial side of things.  It's also painfully clear from Ostosh's personal spending habits that he had little, if any, understanding of spending controls and budget lines. Indeed there is little to show that Ostosh had any role to play in the finances of these companies and, for these reasons, the Court discerns no clear error.

### iii.  A Satisfactory Explanation Does Not Require Documentation

KCI next argues that the Bankruptcy Court abused its discretion by finding Ostosh had provided a satisfactory explanation without having produced documentation or other corroborating evidence.  (KCI Br., ECF No. 11, PageID.1810-1814).  Only in extraordinary circumstances, KCI avers, does a debtor provide a sufficient explanation while failing to produce corroborating documents.  KCI sets too high a bar:

15

> [t]he word "satisfactorily," . . . may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the [debtors] say with reference to the disappearance or the shortage . . . . He no longer wonders.  He is contented."

*In re Devaul*, 318 B.R. 824, 840 (Bank. N.D. Ohio, 2004) (citing *In re Craig*, 140 B.R. 454, 459 (Bankr. N.D. Ohio 1992)); *In re Jarett*, 417 B.R. at 905.    While it would have been preferable to have more corroboration, KCI fails to cite to a case that adopts the rule it seeks.  Whether a satisfactory explanation has been given is inherently a case-specific determination.  A court may conclude that additional documentation is necessary, or a court may find the testimony persuasive enough that more is not needed.  *See In re Stiff*, 512 B.R. 893, 900 (Bankr. E.D. Ky. 2014) (noting "a debtor can defeat a § 727(a)(5) action by offering persuasive testimonial explanations of his loss of assets.").

Ostosh gave a specific and credible explanation for the dissipation of this pre-petition income—he spent it as he took it in.  After hearing from both sides, the Bankruptcy Court found that testimony to be specific and credible.  That was all that was necessary for a satisfactory explanation.

Accordingly the Court affirms the decision of the Bankruptcy Court in denying KCI's Section 727(a)(5) claim.

## 2.  Section 523(a)(2)(B)

KCI next argues that the judgment debt is exempt from discharge under Section 523(a)(2)(B).

> In order for its debt to be declared non-dischargeable under § 523(a)(2)(B), a creditor must prove by a preponderance of the evidence that the debtor owes the creditor a debt for money, property, or the extension of credit that was obtained by the debtor through the use of: (1) a written statement; (2) the written statement was materially

16

> false; (3) the written statement concerns the debtor's financial
> condition; (4) the plaintiff reasonably relied on the statement; and (5)
> the debtor published the writing with the intent to deceive the plaintiff.

*In re Anzo*, 547 B.R. 454, 465 (Bankr. N.D. Ga. 2016). The issues under this section presented by

KCI for appeal are (1) whether WMCB reasonably relied on Ostosh's materially false statements

in the September 2008 e-mails and (2) whether Ostosh provided the emails with intent to deceive

WMCB or with reckless disregard for the truth.

### a.  WMCB Did Not Reasonably Rely on the September 2008 e-mails

"The issue of reasonable reliance is more completely considered as two questions: (1) Did

the creditor rely on the materially false financial statement of the debtor; and (2) Was that reliance

reasonable?" *In re Plechaty*, 213 B.R. 119, 126 (Bankr. 6th Cir. 1997). The Bankruptcy Court

found that KCI had not established an affirmative answer to either question. The Court agrees.

### i.    Actual Reliance

"Evidence that demonstrates that a loan would not have been granted if the creditor had

received accurate financial information is sufficient to show reliance." *In re Kleiman*, No.

05-06158 (RTL), 2007 WL 1480716, at *6 (Bankr. D.N.J. May 18, 2007). KCI argues that

WMCB's contemporaneous business records made in a "Watch Loan Report" demonstrate that it

relied on Ostosh's assertions regarding the availability of his phantom stock and his ability to

liquidate it. The Court is not persuaded. To the contrary, the records KCI depends on show that

WMCB did not rely on Ostosh's assurances that he could liquidate the phantom stock.

WMCB's records entered after the loan was granted state:

> While Tim Maczka [a possible investor] is still very interest[ed] in
> pursuing a partnership with Chris in Krieger, **Chris has been
> unable to liquidate his stock in Commercial Tool thereby
> stalling this process.** He reached an agreement with Doug
> Bouwman, owner of Commerical Tool, to sell back his stock for
> $400M. However, Doug wasn't willing to pay him a lump sum

17

instead wanting to pay Chris $100M each year for the next four
years. **Since this wouldn't provide Chris the necessary funds to
pull this deal together with his investor,** Chris approached Hi-
Tech, Krieger's largest customer; about their interest in buying the
company, at least injecting some capital.    After advanced
discussions, Hi-Tech's CFO indicated that though they had
significant interest and a large line of credit, they were limited by
their advance formula and as such had no ability to work out a deal.
**As a result, the Bank approved a revised financing structure**
where the[] Bank lent Chris Ostosh $500,000 with $100,000 paying
off his existing note and $400,000 being paid to Krieger Craftsmen
to cover their overdraft and bring all notes current.  This note was
secured by a junior mortgage on Chris's residence and further
support by the corporate guarantees of Krieger Craftsmen and
Krieger LLC limited to $400,000 each.  In addition the Bank
assigned to each entity the Bank's right and security interest only
upon complete satisfaction of the Guaranty and Chris's obligation
to Bank.

This financing arrangement gives both parties roughly 30 days to
figure out how to close the proposed business sale.  Chris will
continue to work with Doug Bouwman this week to work out an
agreement.  In addition, Chris will have additional dialogue with
Tim Maczke about upping his capital injection for an increased
ownership stake.

(ECF No. 7-6, PageID.603) (emphasis added).

The most natural reading of this report is that WMCB did not rely on Ostosh's

representations regarding his phantom stock in approving the loan.  Rather, the bank made the loan

despite the fact that Ostosh was unable to liquidate the stock prior to the loan.  When Ostosh was

unsuccessful with liquidating the stock and obtaining financing from two other investors, the bank

agreed to approve the loan with the expectation that Ostosh would be able to purchase the company

within 30 days. From WMCB's point of view, the short term loan cleared up overdrafts that would

otherwise have been potentially reportable to the FDIC at the end of the quarter.

Furthermore, the WMCB's report on the emergency loan stated that the repayment source

would be cash flow from operations / liquidation of collateral / enforcement of guarantees.  (ECF

No. 16-10, PageID.1969).  Nowhere did it say that repayment would come from Ostosh only, let alone from phantom stock.  To the contrary, the bank's representative testified that that cash flow from operations is "normal business cash flow.  Your profits, adding back noncash items, whatever you have available to service debt."  In other words, it was money that was generated by the operation of a business that the bank was looking to as debt service.  (Tr. at 316, PageID.1327). WMCB also chose not to ask that the primary source of stock be put up as collateral, further undermining the actual reliance argument.

For these reasons, the Court agrees with the Bankruptcy Court that WMCB did not rely on Ostosh's e-mails when it approved the loan.  Rather, having gone as far as it did, and with a significant amount of red on its ledger, WMCB was determined to keep KCI afloat for the bank's own purposes, while KCI searched for further investors.

### ii.    *Reasonable Reliance*

But even if WMCB actually relied on the September 2008 e-mails from Ostosh, the reliance was not reasonable.  "Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances"  *In re Ledford*, 970 F.2d 1556, 1560 (6th Cir. 1992).  Reviewing courts consider the following factors in performing this analysis:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* (citations omitted).

Applying these factors, WMCB's reliance on the September 2008 emails was not reasonable. There were several red flags that would have alerted an ordinary and prudent lender to the possibility that the representations in Ostosh's emails were not accurate. First and foremost is the failure to require an updated PFS from Ostosh, even though one had been requested before. By 2008, the one on hand was stale, and WMCB had already approved an intervening loan without obtaining an updated PFS, even though it was noted one was needed. Then there is the hedging within the emails themselves. For example, on September 16, 2008 Ostosh told Berens "I have many missed promises" regarding his Commercial Tool & Die stock. (ECF No. 16-8, PageID.1963). Ostosh suggested another option which was to sell to a different company. Earlier, Ostosh said he was "at their mercy" regarding Commercial Tool & Die. Ostosh's own expressed doubts undercut any reasonable reliance by the lender on the stock.

These previous business dealings, rather than give rise to a relationship of trust, should have given rise to suspicion. Ostosh never gave WMCB the financial information it requested, and instead of paying down its debt, KCI's overdraft fees ballooned under Ostosh's stewardship. Given the totality of the circumstances, to the extent WCMB relied on Ostosh's September 2008 e-mails in making its decision to loan KCI $500,000, the decision was not reasonable, as the Bankruptcy Court found.

### b. Ostosh's Misrepresentations Were Not Intentionally and Materially False

"[I]f the debtor either intended to deceive the Bank or acted with gross recklessness, full discharge will be denied" under Section 523(a)(2)(B). *In re Martin*, 761 F.2d 1163, 1167 (6th Cir. 1985). In other words, "full discharge may be disallowed if the debtor either intended the statement to be false, or the statement was grossly reckless as to its truth." *Id.*

20

The Bankruptcy Court found that Ostosh's September 2008 emails did not meet this standard:

> Because of the Debtor's subjective belief in his entitlement to the Commercial stock, his disclosure of the difficulties he had encountered in liquidating the stock, and the fact that liquidation of the stock was one of many options the Debtor discussed with the Bank for raising capital to fund his purchase of KCI, the court finds that the representations in the emails were not made with the intent to deceive the Bank or with gross recklessness as to their truth.

(ECF No. 7-9, PageID.1766).

KCI argues that the Bankruptcy Court's decision contradicts itself because Doug Bouwman testified that he never met with Ostosh or scheduled a meeting with Ostosh in 2008 and the Bankruptcy Court found the testimony credible. (ECF No. 11, PageID.1843). Earlier, the Bankruptcy Court had found that "[b]oth versions of events are potentially credible" with regard to Ostosh's and Bouwman's testimony. The Bankruptcy Court concluded, however, that given the lack of documentary evidence and Ostosh's inability to enforce the stock agreement, that Ostosh did not have an enforceable phantom stock interest in Commercial Tool & Die. (ECF No. 7-9, PageID.1758). There is no conflict between this portion of the Bankruptcy Court's decision, however, and its latter finding on Ostosh's intent or gross recklessness. With respect to the latter determination, the Court found Ostosh's testimony was credible that he believed, and continues to believe, that he was entitled to the phantom stock, notwithstanding his failure to pursue those rights. (ECF No. 7-9, PageID.1766). This earnest belief, and his expressions regarding difficulties in obtaining the financing, satisfied the Bankruptcy Court that there was no intent or gross recklessness.

On this record, the Court cannot say that the Bankruptcy Court abused his discretion in this regard and the Court agrees, on de novo review, that KCI fails as a matter of law on the Section 523 cause of action.

## CONCLUSION

For these reasons, the September 20, 2018 decision of the United States Bankruptcy Court for the Western District of Michigan in Bankruptcy Case No. BG 15-04059 and Adversary Proceeding 16-80072 is **AFFIRMED.**

**IT IS SO ORDERED.**

Dated:   __April 5, 2019__             _/s/ Robert J. Jonker_____
                                       ROBERT J. JONKER
                                       CHIEF UNITED STATES DISTRICT JUDGE